Frank DRLIK, Libellant,

v.

IMPERIAL OIL LIMITED, Respondent
(American Ship Building Company,
Inc., Impleaded Respondent.)

No. 3548.

United States District Court
N. D. Ohio.

Jan. 17, 1955.

J. Harold Traverse, Cleveland, Ohio, and Edward Hagerty, of Miller, Hager-ty & Shoemaker, Toledo, Ohio, for libel-lant.

Lucian Y. Ray and H. W. D. Kilgour, of McCreary, Hinslea & Ray, Cleveland, Ohio, for respondent.

McAlister Marshall and Robert B. Preston, Jr., of Arter, Hadden, Wykoff & VanDuzer, Cleveland, Ohio, for im-pleaded respondent.

CONNELL, District Judge.

We will first thank all counsel for their courtesy, their preparation and zeal, fair-ness and expedition throughout.

As to the injury sustained by Frank Drlik, Libellant, on August 8, 1952, and the question of responsibility or liability therefor the Court finds as follows:

That at the time and place in question, in preparing for undocking respondent's vessel, Imperial Leduc, after the comple-tion of some months of repairs thereon, the libellant Drlik along with two other members of a dock gang of three, of which he was in charge, sustained se-vere injuries as the result of the tight-ening of a wire rope or cable of which he then had hold.

That the tightening of same was caus-ed by the turning on of a winch engine on the deck of such vessel by its oper-ator Pether, respondent's employee, who applied the power which tightened said wire rope at a time when he, Pether, could not see the point at which such force was to be applied, and when re-spondent had no employee as watchman at its rail to apprise Pether of the safe-ty or danger of such move.

The Court finds that at the time and place in question there were four or five lines to shore attached to the winch en-gines of such vessel. That Drlik and two other dockmen were assigned to handle the line attached to winch engine number 5 operated by Pether. That oth-er dock crews were to handle other lines, all under the supervision of docking fore-man Cosmo, an employee of the Ameri-can Ship Building Company, the implead-ed respondent. That in order to get the vessel out of the dry dock, other activi-

ties had first been accomplished, water had been let in, the ship was afloat, and the immediate object sought to be accomplished was the movement of the ship a short distance aft into the river so that a tug could then assist it without being endangered by its proximity to any part of such dock. That such first movement of the ship was to be attained by moving cables from spiles to which they were already attached to spiles closer to the river, whereupon the drawing taut of such cables would accomplish such result. That such ship was twelve feet from each side of such dry dock and that such movement was required to be so made as to prevent contact with same and so as to keep it in a safe position through the synchronized application of force through such four or five wire ropes and the withdrawal of such force therefrom.

The Court finds that Drlik and his two companions, working some eight or ten feet from the edge of such dock, had moved the cable from one bollard or button to another towards the aft end of the ship; that the deck of the ship was some fifteen feet higher than the dock; that Drlik worked to the left of his companions and between them and the ship; that such three men moved approximately 100 or 120 feet in the direction of the river while moving such cable; that his companions handled the "eye" end of the cable which was to be placed over the spile while Drlik handled the slack part of the cable between his companions and the ship.

That during this movement along the dock, this movement of 100 or 120 feet, the slack of the cable hanging over the edge of the dock became caught several times on the ends of the railroad ties or the corners of the ends of such ties extending over the edge of such dock; that Drlik reached down on each occasion to extricate the cable from such tie; that just as his companions dropped the "eye" over the spile and while Drlik was in a stooped position with both hands on such cable and just after such last extrication of the cable, the cable became taut with great force and threw Drlik around, above, and down to such railroad tracks resulting in the injuries of which he complains.

The Court finds that throughout this earlier undocking activity Drlik had worked on the port side of such ship during the process of letting water into the dry dock, closing the gate, opening its valves, etc. That before water was let in, the boat crew had tightened the ship's lines; that the process took one and a half hours during which time no dock man was on such ship. That there were some 31 members of the crew including some of its officers aboard. That there was no watchman assigned by the ship at the rail at the time of the happening here in question. That after the gate was tied up, Drlik's orders from his superior were, along with two companions, to "go on the middle line, which then was tight".

The Court finds that these three men moved such cable off its original spile in accordance with a signal or indication first given by a blonde person at the ship's rail who has not been specifically identified; that the tightening of the cable set the ship in some motion; that its winch operator, Pether, had gone from the winch engine on the starboard side of the ship to its port side where Drlik and his companions were working and had done so four or five times and had made his own observations visually for the purpose of determining and that he did so determine when to apply and when to release the force and tension on such cable. That he went a considerable distance these four or five times from the rail at a point fifteen feet above the dock to his winch engine on the opposite side of the ship.

The Court further finds that the final application of force through such cable while Drlik held it and which resulted in Drlik's injuries was made by winch operator Pether without any signal from the dock so to do or from Pether to the dock that he so intended, and solely on Pether's observation as made the last time he was at the rail before returning

to the winch engine for the application of power which resulted in Drlik's injury.

The Court further finds that it has been the invariable practice of respondent to post watchmen at its rail before operating winch engines and while operating winch engines whenever its own crew has in the past handled the shore end of the cable.

The Court further finds that the failure of the officers of the ship to post a watchman at the rail or to give warning to the dock crew in any form was the proximate and direct cause of libellant's injuries and but for which this never would have happened. That its ship's officers had a clear duty to post such watchmen at such rail for such purpose; that the winch operator had a clear duty not to operate its winch without a watchman posted at such rail; that such failure on the part of respondent constitutes unseaworthiness of the vessel and negligence and created for libellant an unsafe place in which to work.

The Court further finds that during the movement of the cable some 100 or 120 feet aft and while Pether had had the dock gang under some observation while he had been several times at the rail, the resiliency or slack in the cable had caused it on at least two occasions to foul and catch upon the ends of the railroad ties, so that Drlik's attention was necessarily engaged in its extrication, which required his constant visual attention to the cable itself, and which distracted from any opportunity on his part to watch the rail of the ship whose deck was fifteen feet above the dock on which he worked. That while Pether claims that all was well with the cable and with the dock gang when he, Pether, last left the rail to return to the winch engine, the Court nevertheless finds that the application of force through the cable was very close to the dropping of the "eye" in point of time over the spile, and the Court therefore finds that Pether's application of force through the cable, caused by turning on the winch engine, was not made as the result of any

observation of Pether that the "eye" of the cable was safely and successfully over the spile and that the tightening of the cable could be done in safety. The Court finds that Pether's application of such force under such conditions deprived Drlik of a safe place in which to work; and that the posting of a watchman would have given the ship and its operator Pether notice that the cable had caught on a tie and that Drlik was in a position of great danger while in the process of extricating the cable and would thus have prevented his injuries. The Court further finds that it would have been physically impossible for Pether to have seen the dock or this dock gang from the point at which he applied the force after he had walked back to the winch engine from the rail on this last occasion.

The Court finds no assumption of risk on the part of libellant. He could not see who or what was on the deck above him. His task was to watch the cable. It was the task of a watchman at the rail to have watched and protected both the dock gang and the ship.

The Court therefore finds that respondent's claim that libellant or his direct employer, impleaded respondent, had exercised or attempted to exercise some control over the ship or some supervision over its operator is not tenable. The Court finds that such impleaded respondent had a contractual duty to assist respondent in this undocking operation by providing a dock gang on the shore end of its lines. The Court finds that impleaded respondent discharged that duty to so assist respondent by supplying Foreman Cosmo and a dock gang on the shore end of each of its lines, but that neither Cosmo nor any member of his dock gang assigned to the five lines attached to the spiling on the dock had any authority over such ship or responsibility for any of the crew members of same.

We can not find that to "assist" another on the shore end of a line or at the shore end of one out of five lines means

to so supersede him in authority as to manage, supervise and control the ship at the other end of that same line.

█ We find the claim of respondent that it merely followed the dock hand's orders in moving its ship, or in turning on its power is not well taken. As between differing claims and different testimony we must consider all the evidence in the case and what the probabilities were herein. The claim of the respondent that there was no purpose whatsoever in turning on its power is highly improbable. If no purpose, why turn it on at all?

We find that the first mate had ordered the operator of this winch engine to stand by the same. It is highly probable that he did so. It is also highly probable that any next or other orders such operator would follow would necessarily have to come from some officer of the ship, for the safe movement of this magnificent 641 foot tanker out of that dry dock was highly important to all.

That Pether made his own observations as to what was going on on the dock is highly probable for he had no watchman at the rail to see for him. That he made his own decision as to when to apply the power is highly probable for both men on the dock say that Pether was given no signal from the shore; in fact, all dock men were very busy with the cable up to practically the instant of its having been tightened. None of them would have had time to signal had they so desired. But Pether had decided what to do when he was last at the rail—and in a sense blindly—he had already applied the power. It is highly improbable that any signal was given from shore. It is highly improbable that any was expected or depended on. It is highly improbable that Pether was taking orders from any one but his own officers. This decision and action was Pether's alone. His own officers had failed to post a watchman at the rail, so Pether acted in the dark.

█ The price list which was part of the contract between the respondent and the impleaded respondent herein relates that "necessary help ashore furnished without charge". We can not find that "necessary help ashore" can possibly be tantamount to supervision, management, or control. We find no negligence or assumption of risk on the part of this libellant. We find impleaded respondent not here responsible or liable to libellant on any theory of negligence. We find the respondent alone liable in damages to libellant herein.

Now, there is here a claim of indemnifying contract. The respondent has here said, in effect, that if it is herein liable at all then the liability should carry over to the respondent which it impleaded, namely, The American Ship Building Company. It says it made a contract with The American Ship Building Company, which agreed to save it harmless from such action as within.

We find that the contract between the respondent and the impleaded respondent consisted of two letters between them under dates of January 18, 1952 and January 21, 1952 including a certain printed price list. The work of the repairs due to explosion was done on a price list basis as of that time and speed of repairs was essential because the ship had been and was bound to be out of commission for some time.

█ The Court finds that the sending of a document by respondent to the impleaded respondent, which document is called "Specifications" and which was sent as of March 27, 1952, under which respondent now claims it is herein entitled to indemnification by impleaded respondent is of no legal efficacy. It is in blank, it was never signed, no consideration passed for it, it is verbose with language inapplicable to this situation, it was never in contemplation between the parties, never written or talked about. The President of The American Ship Building Company, impleaded respondent, never saw it until he saw it in this Court room. The respondent after having sent same to impleaded respondent never asked impleaded respond-

ent what it thought about such specifications and The American Ship Building Company never told them what it thought. It was completely ignored throughout. It certainly never constituted any mutual agreement between these parties to do anything. The testimony seems to be that a mistaken form was sent. However, it had no connection with or reference to the work then being done and we believe and hold that as a matter of law, legally, it is an absolute nullity.

From all the evidence in the case the Court finds that Frank Drlik has been totally and permanently disabled as far as being a dock hand goes and as far as being hireable is concerned. Men of his age and the physical incapacities and impairments from which he now suffers and the disturbed balance from which he now suffers are not wanted as employees anywhere. They are simply not hireable. They are unemployable. If at his age he had health he might have great difficulty getting a job under the conditions which now obtain throughout this country. But nevertheless we do consider him totally and permanently incapacitated from being employable or employed. We can not expect that employers will invent jobs to fit the particular kind of physical incapacities from which this man suffers as the result of this injury.

He had been thirty-seven years at this work. His employer seems to respect him as a personality. His employer has been fair and kind to him. But his employer cannot hire him. The employer considers him permanently and totally disabled and has treated him as such. Their doctors say that that is so. All doctors for both sides agree as to the sincerity and cooperation of Drlik. Respondent's doctor says that his labyrinthian vertigo is due to the injury. There seems to be no question of his ear trouble, his dizziness, his instability, and the constant danger of his suffering therefrom.

There are two medical divergencies of consequence in the case. Drlik testified he was unconscious twelve or thirteen hours and the doctor at the hospital to which he was taken said that he had talked, he believed, a half hour or three-quarters of an hour after his estimate of when the injury took place. The other divergency is that respondent's doctor, Dr. Nosik, believes that certain new medicines might help one of the conditions from which he suffers while other doctors did not so believe.

Now, we get down to what he should be paid because he should be paid in advance, discounted, allowing for all the reasonable probabilities in the case, assuming he will never work again and that he will live the average length of life. His loss is based on two things, as you all know and as you have argued herein, the first of which is the loss of earnings and the second of which is the pain and suffering. Each subject requires consideration.

He is now sixty-four. He was then sixty-two. He has been out of work two and a half years. His counsel averaged up five different computations on expectancy of life which seems both reasonable and probable to the Court. His average of 14.02 years of expectancy seems fair. Drlik's last year was one in which he was paid for his work the sum of $4,530. I will assume the two and a half years which have since elapsed would have been as good for him. We did produce in 1953 and 1954, one hundred ninety nine million tons of steel which should have caused whatever work Drlik or others would have done in that yard to have averaged up as well as the preceding year.

At the rate of $4,530 for two and a half years he would have already suffered a loss, as had been mentioned, of $11,250.00. The discount basis of $9.25 for each dollar as was suggested by his counsel as a matter of mathematics I accept, but the yearly average to which it is to be applied must be changed from the amount which we already have used for 1952, '53, and '54 for the two and a half years involved. One must take a reasonable and probable average and I believe in view of the fact that men decline even during the expectancy, that

the taking of the average of the preceding years will have been fair to all and that was $3,538.89, and we will call it for our purposes $3,600 which times the $9.25 equals a total of $33,300. So that for his loss of earnings it will be our finding and ultimate judgment that he should be here reimbursed in the sum total of those two sums of $11,250 plus $33,300 which is $44,550.

Now, we will consider pain and suffering. And as counsel for respondent said, we can not put X dollars on each fracture. We can not put a dollar sign on each particular pain or a particular day or date. But in attempting to figure out what these probabilities are and trying to guage a thing it is worth considering that one wouldn't himself sustain what this man sustained that first month for a thousand dollars a minute, if he had a choice. Granted that he had no choice and that it happened and that we are trying to make him whole again, it is my belief that a figure for his first month of great misery and suffering in the amount for which he should be compensated for that month, which figure I believe is not too generous at $100 a day for such misery would be $3,000 for his first month. And I believe for the second month $50 a day or $1,500; and for the next four months $20 a day for what he underwent, for what he had undergone before he left the hospital or $2,400 down to the time he came home on a cane. I believe in the intervening two years that the pain and discomfort and irritation and irritability and constant fear of dizzy spells and frequency of having them, particularly in view of instability which seems to be constant and annoying with him, I believe in these intervening two years his pain and suffering should entitle him to compensation at the rate of $100 a month or $2,400. I see no prospect from all that I have seen and from all the evidence in the case and from the medical testimony, from observation of the man, looking at the man, I see no prospect of his ever being in any other condition than the one he is in. I think for the balance of his time he ought to be paid $100 a month or $1,200 a year discounted times the $9.25 figure which comes to a total of $10,100. Therefore I will find for him damages herein for his loss of earnings in the sum of $44,550 for such loss of wages past and prospective for the rest of his prospective life, and $19,400 for his pain and suffering past, during his particularly bad six months, during the past two years and for the rest of his life of $19,400, or a total of $64,950. I will ask counsel please to prepare copies of what I have herein had to say and please prepare an entry accordingly with exceptions to all who choose to make them.

Mr. Ray: That amount adds to $63,000, your Honor.

The Court: If it does, that is what it should be. You are right. Pardon me, gentlemen. $63,950 instead of $64,000. I added wrongly. Anything further, gentlemen?

Mr. Traverse: We will prepare, your Honor, the findings of fact and conclusions of law in accordance with the Court's request.

The Court: All right, gentlemen. That is all.