James JOHNSON, Plaintiff-Appellant,

v.

OIL TRANSPORT COMPANY, Inc., a corporation, Defendant and Third-Party Plaintiff-Appellee,

v.

BENDER WELDING & MACHINE COMPANY, Inc., Third-Party Defendant.

No. 28418.

United States Court of Appeals, Fifth Circuit.

March 12, 1971.

Rehearing Denied and Rehearing En Banc Denied June 24, 1971.

Godbold, Circuit Judge, concurred specially and filed opinion; John R. Brown, Chief Judge, dissented and filed opinion.

Francis M. Thigpen, Ross Diamond, Jr., Diamond & Lattof, Mobile, Ala., for appellant.

A. Clay Rankin, III, Alex F. Lankford, III, Edwin J. Curran, Jr., Mobile, Ala., Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., of counsel, for plaintiff-appellee.

Deutsch, Kerrigan & Stiles, Brunswick G. Deutsch, New Orleans, La., Vickers, Riis, Murray & Curran, Mobile, Ala., of counsel, for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a suit in admiralty by a shore-based shipyard worker for damages for personal injuries against a shipowner, growing out of the servicing and repairing of a vessel in dry dock. James Johnson, an experienced shipyard sandblaster, was injured in a fall to the floor of a dry dock from a scaffolding on which he was standing while sandblasting the outside hull of the M/V FLYING A, which was out of the water, preparatory to the vessel's being painted. The scaffolding, which was made up of various connecting metal sections, had been rented by appellant's employer, Bender Welding & Machine Company Inc., and erected on the floor of its dry dock by Bender employees. The scaffolding extended up and around the vessel but was not attached to it and at no time had appellant been on board the vessel. The platform, from which appellant fell, consisted of two 2x10-inch boards placed side by side upon the scaffolding. According to appellant, the unsupported boards "gave way" when he walked on them. A few minutes later he fell. He did not know what actually caused his fall, whether the boards broke or again "gave way." There was nothing he could grasp when he felt himself falling.

Johnson sued the vessel and its owner, Oil Transport, Inc., alleging negligence and unseaworthiness. The shipowner thereafter filed a third-party complaint against Bender Welding & Machine Company, Inc. for indemnity. Based on the pleadings, various affidavits, depositions and exhibits on file, the District Court then granted the shipowner's motion for summary judgment on the grounds that the allegation of negligence was not supported by the undisputed facts, and that plaintiff was not entitled to the warranty of seaworthiness because (1) the vessel was not in navigation at the time of the accident complained of and (2) plaintiff was not performing the type of work traditionally performed by seamen.

For reasons which follow, we affirm the District Court. We agree that the facts do not support a finding of shipowner negligence, that no warranty of seaworthiness was owing to appellant as the vessel was not in navigation, and further that appellant was not performing seaman's work when injured.

## THE NEGLIGENCE ISSUE

■ Appellant's charge of negligence is predicated on the alleged failure of appellee to provide him with a safe place to work.[1] There is no contention, however, that the vessel itself was unsafe. The place upon which appellant was working—the scaffolding and dry dock upon which it rested—was not provided by the shipowner but by appellant's employer Bender. The District Court found from the undisputed facts that "appellant never went aboard the vessel, * * * he never touched the vessel. His work was to be performed completely on the outside of the vessel with equipment which was owned and man-

---

1. "Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work." West v. United States, 361 U.S. 118, at 123, 80 S.Ct. 189, at 193, 4 L.Ed.2d 161; Stark v. United States, 5 Cir., 1969, 413 F.2d 253; Moon v. United States, E.D. N.Y., 1960, 197 F.Supp. 406; Drlik v. Imperial Oil Limited, N.D.Ohio, 1955, 141 F.Supp. 388. West, however, rejected the contention that such a duty was owed under the circumstances of that case, stating: "Petitioner overlooks that here the respondent had no control over the vessels, or power either to supervise or to control the repair work in which petitioner was engaged. We believe this to be decisive against both aspects of plaintiff's dual theory." 361 U.S. at 123, 80 S.Ct. at 193.

aged by his employer and which was shorebased. The plaintiff worked completely under the direction and supervision of Bender's personnel. None of the equipment or scaffolding was supplied, operated or owned by the defendant." The additional finding by the Court, that the vessel and the overhaul operation were in the complete care and custody of the shipyard, is satisfactorily established by the record.[2] The District Court, therefore, correctly dismissed the negligence claim.

## THE WARRANTY OF SEAWORTHINESS

 In order to prevail under the unseaworthiness aspect of this case, appellant as a dry dock-based non-seaman must show that he fits somewhere between the broad confines of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S. Ct. 872, 90 L.Ed. 1099 (1946), on one end of the spectrum, and the outside limitations of West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d (1959), on the other. Essential to the existence of the warranty of seaworthiness is the in-navigation status of the vessel. The principle is self-evident. If the vessel is not in navigation there is no warranty of seaworthiness. Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961).[3] Noted to this statement in the margin in *Roper* is the following language:

"The view that a vessel not in navigation extends no warranty has often been expressed in the more familiar context of to whom does the warranty extend. E. g., Union Carbide Corp. v. Goett, 4 Cir., 1958, 256 F.2d 449. Implicit within such cases is the reasoning that those working on vessels not in navigation are not seamen (or doing seamen's work) and consequent-

---

2. Apart from appellant's untenable theory of negligence based on an alleged unsafe place to work, we know of no basis for a negligence claim other than the Extension of Admiralty Jurisdiction Act, which is not applicable here. The Act declares in pertinent part: "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. § 740. It would obviously be illogical to theorize that the vessel itself could have caused the defect in the scaffolding, cf. Thompson v. Calmar Steamship Corporation, 3 Cir., 1964, 331 F.2d 657, or that the impact of a shipowner's tort emanating on board the vessel was felt ashore, cf. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963).

3. *See also* Desper v. Starved Rock Ferry Co., 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952), in which the issue presented was whether a decedent was a seaman at the time of his accidental death. The facts indicated that "the boats were not afloat and had neither captain nor crew. They were undergoing seasonal repairs, the work being of the kind that, in the case of larger vessels, would customarily be done by exclusively shore-based personnel." The Court concluded that while decedent had been engaged in such repair work he was not a seaman and that the "distinct nature of the work is emphasized by the fact that there was no vessel engaged in navigation at the time of the decedent's death." 342 at 190, 191, 72 S.Ct. at 218.

In Stark v. United States, 5 Cir., 1969, 413 F.2d 253, 254, we refused to extend the warranty of seaworthiness to employees of a ship repair company who were injured while working inside tanks of a vessel which was undergoing a complete overhaul and reactivation and was neither in possession nor control of the shipowner. It was a "dead ship, incapable of navigation and unable to serve any of the purposes of a vessel in navigation." We agreed with the District Court's application and interpretation of *West* "as authority for the proposition that there is no warranty of seaworthiness where the vessel has been withdrawn from navigation and placed in the custody and control of another." However, we remanded on the issue of negligence. In so doing we noted that, unlike the facts in *West* in which the repair work created the unsafe condition, there was unanswered the question of whether the shipowner had in fact turned over a ship that was a reasonably safe place in which to work. We are not confronted with that problem here.

ly not among those employees protected by the warranty of seaworthiness." 368 U.S. at 24, 82 S.Ct. at 7, 8. Consequently, if the vessel here was not in navigation it follows that the work appellant was performing at the time of the accident was not seamen's work, and that the District Court properly held no warranty of seaworthiness was owed.

The question of whether the warranty of seaworthiness should attach to a vessel which had been turned over by its owner to a contractor and dry docked for repairs or reactivation was considered extensively by the Supreme Court in West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). There a United States vessel, the MARY AUSTIN, which had been "deactivated" for "several years" was turned over from the "moth ball fleet" to an independent contractor for reactivation and a complete overhaul. An employee of the contractor was injured while working inside a low pressure cylinder when a loose-fitted plug hit his knee. Under the agreement the "contractor was to have complete responsibility and control of the making of the repairs, with the right in the United States to inspect the work and materials to insure compliance with the contract. For this purpose, the United States placed six of its men—a captain, chief mate, second mate, chief engineer, assistant engineer, and steward —on board the vessel. However, they signed no shipping articles and had no 'control of the ship in the ordinarily accepted context,' their sole function being to serve as inspectors for the United States." 361 U.S. at 119, 120, 80 S.Ct. at 191. Under these circumstances, the Supreme Court affirmed a judgment denying recovery against the shipowner on claims of negligence and unseaworthiness, holding, *inter alia*, that "[t]he Mary Austin, as anyone could see, was not in maritime service." 361 U.S. at 122, 80 S.Ct. at 192. The Court made numerous important observations, useful as governing principles, in finding that no duty was owed to the injured worker. For in-

stance, it reiterated the *Sieracki* principle that the warranty applies when a shoreworker "is, in short, a seaman * * * doing a seaman's work and incurring a seaman's hazards." 361 U.S. at 120, 80 S.Ct. at 192. It distinguished the case from those in which the vessels "were, at the times of the injuries, in the hands and under the control of the owners or charterers, and, instead of undergoing general repairs, were in active maritime service in the course of loading or unloading cargo pursuant to voyages." 361 U.S. at 121, 80 S.Ct. at 192. It indicated that the warranty requires something more than the circumstances of the employee merely being "on board ship and performing work traditionally done by seamen," 361 U.S. at 120, 80 S. Ct. at 191, and that the warranty does not attach when the vessel is "not in maritime service * * * * undergoing major repairs and complete renovation" with petitioner taking "his orders from the contractor, not the shipowner * * * *" in an "undertaking" which "was not 'ship's work' but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy." 361 U. S. at 122, 80 S.Ct. at 192.

The Court, in *West*, further said:

"It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury."

361 U.S. at 122, 80 S.Ct. 192.

The following year, in Roper v. United States, *supra*, the Supreme Court cited its decision in *West* with approval and said:

"The test for determining whether a vessel is in navigation is the 'status of the ship,' West v. United States * * *."

368 U.S. at 22, 82 S.Ct. at 7. The vessel in *Roper*, a deactivated Liberty ship, had

been relegated to the "moth ball fleet" and later used solely as a granary. A longshoreman was injured while assisting in an unloading operation of grain from the vessel after it had been towed to a grain elevator for that purpose. The issue presented was whether events subsequent to the ship having been withdrawn from navigation altered this status. The Court held that the ship had not been converted to any navigational use; further, that the vessel had been moved under the control of the tug captain, and that there was no warranty of seaworthiness in favor of the injured longshoreman since the vessel was not in navigation.

Governed, therefore, by the guidelines in *West*, as substantiated by *Roper*, we inquire into the question of control over the repair operations and the nature and extent of those operations in order to determine if the FLYING A was in navigation at the time of the accident.

Prior to the injury complained of, Oil Transport, Inc. and Bender Welding & Machine Company, Inc. entered into an agreement under which Bender contracted to perform a general overhaul involving certain repairs, maintenance and other services to the FLYING A at Bender's shipyard in Mobile, Alabama. The work covered numerous items which are detailed in an eighteen-page invoice. On June 8, 1966, the vessel was placed in dry dock. Work was begun on the following day and completed nine days thereafter on June 18, at a total cost of $29,160. The accident occurred in the interim, on June 12. During the time the vessel was in dry dock, electrical power and water for fire protection were shorebased and furnished by Bender. No meals were prepared and no watches kept on board. Upon completion of the work she returned to her regular loading operations. One propeller of the twin-screw vessel had been removed at the time of the accident. It was established by affidavit of Bender's Vice President that no officer or crewman either went aboard the vessel or

was present at the shipyard with the exception of the Chief Engineer, who was quartered ashore in the City of Mobile and who visited the yard periodically to inspect the work. The function of the Engineer was to order or authorize various items of repairs and to approve the work upon completion. The repairs were made under the supervision of Bender personnel and included the following:

Sandblasting and painting the entire hull and superstructure, dismantling of the generator heads and pistons, opening the main generator bearing for inspection, removing and installing new generator valves, replacing cargo header lines with larger ones, removing the starboard propeller from the vessel and sending it to a shoreside independent contractor for repair and balancing, removing the starboard tail shaft and propeller shaft for repair, removing the starboard stern tube bushing for repair, and numerous other incidental items.

Absence of a crew aboard the FLYING A and a total lack of any participation by the crew in the repair activities performed by Bender were corroborated by affidavit of the President of Oil Transport Company, Inc., as was the statement that the Chief Engineer was the only individual connected with the FLYING A who went aboard the vessel but who remained in Mobile and was not aboard the vessel during the period of repairs. Appellant submitted no counter affidavits, relying instead upon depositions and exhibits already of record. The only evidence which appellant contends is disputed is that relative to the question of whether any member of the FLYING A remained aboard the vessel and the related question of control and supervision of the repairs. But an examination of the record shows no dispute of any material fact in this regard. To the contrary, much of the evidence pointed out by appellant substantiates the findings of the District Court. Appellant himself admitted in his deposition that to his knowledge only one per-

son was aboard at the time of the accident. He referred to this person as the "mate" or "captain" who offered to render medical assistance while awaiting an ambulance after the accident. But he further admitted that he did not know any of the officers or employees of Oil Transport, had never been employed by that company, and had never seen the Flying A prior to that occasion. Appellant's salary was paid by Bender and he took orders from Bender men. A single statement by deposition of a Bender employee that some of the crew were aboard, but because of the fact that the men "come and go, and this, that and the other," he could not tell whether they represented a full crew or not, was not of significance in view of the aforementioned affidavits and appellant's admitted statements to the contrary. The correctness of the Court's findings that the repairs were performed under the exclusive control and supervision of Bender's personnel, and that the vessel had been totally surrendered to the care and custody of the shipyard, was also substantiated by the daily log sheets of the FLYING A for the time during which the repairs were being made. One entry, made each day including the day of the accident, reads "Routine inspections made." Such activity is not indicative of control by the shipowner when compared to *West* whose shipowner had "placed six of its men—a captain, chief mate, second mate, chief engineer, assistant engineer, and steward—on board the vessel" for the purpose of inspecting "the work and materials to insure compliance with the contract." 361 U.S. at 119, 80 S.Ct. at 191.

In the cases cited by appellant concerned with accidental injuries sustained by workers on vessels in dry dock, it affirmatively appears that a crew of the vessel remained on board during the repairs and that complete control of the

vessel had not been relinquished to the ship repair contractor. For example, in Bodden v. Coordinated Caribbean Transport, Inc., 5 Cir., 1966, 369 F.2d 273, the vessel had been in dry dock for approximately twenty-four days at the time of the vessel-based injury sued on, and repairs to the vessel lacked only three days of completion. Control by the master of the vessel over the injured worker, the presence of fifteen crew members aboard, and the fact that the worker had signed shipping articles, were considered relevant factors in reversing a summary dimissal of the complaint denying seaman's status to the worker and in-navigation status to the vessel. In Union Barge Line Corporation v. Allen, 5 Cir., 1966, 361 F.2d 217, we adopted the District Court's opinion which held, *inter alia*, that a vessel, dry-docked for seven days, was in navigation where the facts showed that the engine room and galley crews remained aboard, the work being performed by the injured shipyard employee (removing or replacing a coupling from a shaft aboard the vessel) was work usually performed by seamen and the work being performed by the ship repair company was usual, routine maintenance work. In Lawlor v. Socony Vacuum Oil Company, 2 Cir., 1960, 275 F.2d 599, the vessel was undergoing no major repairs and the shipowner retained "general control" of the vessel even though control of the pertinent area was by the shipyard. A crew of officers and men were aboard and the work being performed was of the type customarily done by seamen. In that case, however, the vessel after having been in dry dock for three days was moored to a pier in navigable water when the injury occurred aboard the vessel.[4]

It is also important to note that in the cases cited by appellant, the injury to the worker occurred aboard the vessel,

4. In Martin v. Jones, E.D.La., 1968, 296 F.Supp. 878, a District Court case cited by appellant, in which an employee of a ship repair company was injured, the opinion does not state whether the ves-

sel's crew remained aboard for the three-day period during which minor repairs were made. The repairs were performed at a shipyard but apparently not in a dry dock.

not on the dry dock as in the present case.[5]

Obviously no precise common test for determining when a vessel is in navigation underlies the various decisions on the subject. To paraphrase language of the Second Circuit in Hawn v. American S. S. Co., 2 Cir., 1939, 107 F.2d 999, 1000, in discussing the meaning of the term "member of a crew," "It is impossible to define the phrase ['in navigation'], in general terms; the words are colloquial and their fringe will always be somewhat ragged. Perhaps the best hope is that, as the successive variants appear, they will finally serve rudely to fix the borders." The problem is somewhat the same here. Nevertheless, the combination of the variants in the instant case compared with those in the cited cases, including the criteria in *West*, requires the conclusion that the FLYING A was not in navigation when the accident occurred.

In our recent decision in Moye v. Sioux City & New Orleans Barge Lines, Inc., 5 Cir., 1968, 402 F.2d 238 (Dyer, J.), we affirmed a lower court judgment which dismissed the claim of a shore-based repair worker for injuries suffered aboard a barge which was dry-docked in the yard of a ship repairer. We rejected the claim predicated on negligence and unseaworthiness of the barge, and held:

"This work required the barge to be drydocked by Saucer [the ship repairer] who, from the time it received the barge until the work was completed, had exclusive control of the barge and the lighting under which the repairs were effected. The barge was designed to carry no motive power, lights or crew. Sioux City [the barge owner] had no representative or crew aboard at any time while the barge was in Saucer's yard. Under these circumstances we hold that there was no warranty of seaworthiness by the ship owner running in favor of shore-based workers on the vessel."

402 F.2d at 240. Chief Judge Brown, in a concurring opinion in *Moye*, pointed out—and we agree with his observation —that "physical possession and control of it [the barge] does not extinguish the warranty of seaworthiness as to one in the ambiguous—amphibious seaman's status. * * * It is a mistake, but not one made by this Court in this opinion, to read *West* as a holding that once all of the owner-charterers' employees have left the scene the warranties of seaworthiness or Jones Act statutory obligation of furnishing a safe place to work will evaporate." 402 F.2d at 241.

So it is possible, therefore, that an injured ship repair employee may have a valid claim against a shipowner for damages due to unseaworthiness of the vessel where control of the vessel has been relinquished by the owner. But each case depends on its own facts and circumstances, and the instant case is not such a case.[6]

In the present case there was much more than mere relinquishment of possession and control of the vessel. No

---

5. See Bodden v. Coordinated Caribbean Transport, Inc., 5 Cir., 1966, 369 F.2d 273; Union Barge Line Corporation v. Allen, 5 Cir., 1966, 361 F.2d 217; Lawlor v. Socony Vacuum Oil Company, 2 Cir., 1960, 275 F.2d 599. In Drlik v. Imperial Oil Limited, N.D.Ohio, 1955, 141 F.Supp. 388, also cited by appellant, the injury occurred upon a dock to a worker handling the shore end of a cable. However, as in *Lawlor*, the vessel had been removed to navigable water and was being undocked at the time. Not only was the shipowner in control, but the crew and officers were aboard the vessel and the offending act was that of a crew member negligently operating the winch engine to which the cable was attached.

6. Appellant's contention that possession and control of the vessel are immaterial here because in rem liability has been asserted against the vessel, is untenable. As appellee points out [and we have found nothing in the record to the contrary], in rem jurisdiction was not perfected in this case by appellant. There, of course, can be no in rem liability without compliance with the requisites for in rem jurisdiction. See Federal Rules of Civil Procedure, Supplemental Admiralty Rule C.

part of the ship or its machinery was in anywise defective, the vessel did not cause equipment to become defective, and the injury was not sustained aboard the vessel. The worker, who never went aboard the ship at any time, fell from a scaffold which was rented and erected by the ship repairer. The scaffold did not touch the vessel, and the work was under the exclusive charge of the ship repairer. The injury occurred off the vessel when Johnson fell from the scaffolding to the floor of the dry dock. These peculiar facts compel a holding that there was no unseaworthiness of the vessel. *See also* Parker v. Cargill, Inc., 5 Cir., 1969, 417 F.2d 772, in which we affirmed the District Court's rejection of the claim made of a ship repair employee for injuries sustained aboard a barge which was under the exclusive control and custody of the repairer during the operations, and in which the injury was caused either by molasses residue on the barge or a portable lantern left hanging on a ladder. *Cf.* Patterson v. Humble Oil, Etc., 5 Cir., 1970, 423 F. 2d 883, (cert. denied, 401 U.S. 922, 91 S.Ct. 863, 27 L.Ed.2d 826 (1971)), where the claim of a ship repair employee was denied on allegations of negligence and unseaworthiness, the injury having been caused by the defect the employee had come on board to repair, the Court citing West v. United States, 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L. Ed.2d 161 (1959), as follows:

> "It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe."

As recognized by the District Court, the conclusion that the FLYING A was not in navigation in itself is sufficient to defeat recovery under the allegation of unseaworthiness. Roper v. United States, 368 U.S. 20, 23–24, 82 S.Ct. 5, 7, 7 L.Ed.2d 1 (1961). *See also* West v. United States, *supra*; Stark v. United States, 5 Cir., 1969, 413 F.2d 253;

Alfred v. MV Margaret Lykes, 5 Cir., 1968, 398 F.2d 684; Van Horn v. Gulf Atlantic Towing Corporation, 4 Cir., 1968, 388 F.2d 636; Guenard v. United States, E.D.La., 1968, 278 F.Supp. 310; Rogers v. M/V Ralph Bollinger, E.D.La., 1968, 279 F.Supp. 92. Nevertheless, the District Court further found that the plaintiff was not performing the type of work traditionally performed by seamen.

As to this question, the record shows that appellant was employed as a sandblaster and was performing this work when he was injured. The contract under which Bender was operating required, among other extensive repairs, that the hull and superstructure of the vessel be sandblasted in order to condition it for painting. Appellant argues that the sandblasting operation is in essence merely a current extension of the ancient and traditional work of chipping customarily performed by seamen prior to painting a vessel. It was established by appellee that the gear and equipment required for sandblasting are not carried aboard vessels at sea, that sandblasting requires certain skill, training and experience and is the work of a specialist. We agree with the District Court that the specialization required for sandblasting removes the work performed from the realm of seaman's work. *See* United N. Y. & N. J. Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); McCown v. Humble Oil and Refining Company, 4 Cir., 1969, 405 F.2d 596. As we noted in Atkins v. Greenville Shipbuilding Corporation, 5 Cir., 1969, 411 F.2d 279, 282 (cert. denied, 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96 (1969)), "[T]he limiting factor of tradition * * * requires that the injured shore-based worker be engaged in work traditionally that of a seaman * * * excluding those persons performing such tasks as making major repairs requiring drydocking or special skills." *See also* Watz v. Zapata Off-Shore Co., etc., 5 Cir., 1970, 431 F.2d 100. In *Watz* we denied the warranty of seaworthiness to an injured shore-based shipbuilding em-

ployee, where the vessel under repair had left dry dock, was then in navigable waters, and the injury occurred aboard the vessel—the latter two factors not being present here. The status of the ship, the pattern of repairs and the extensive work involved were decisive in our holding in *Watz* that the ship was not in navigation at the time of the injury. Furthermore, looking to the "extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury," *West*, 361 U.S. at 122, 80 S.Ct. at 192, we reach the same conclusion here—the work was not of the type customarily performed by seamen, and there was no warranty of seaworthiness due to appellant.

Affirmed.

GODBOLD, Circuit Judge, concurring specially:

I concur in the result reached by Judge Ainsworth. I concur in his opinion on the negligence issue. On the issue of seaworthiness, I concur in his view that no warranty of seaworthiness was owed because the vessel was not in navigation.

JOHN R. BROWN, Chief Judge (dissenting):

This is a most troublesome area. I will contribute nothing to the Court's running solution of its many variables by a too doctrinaire approach. Recognizing, therefore, that the answer is not easy I nevertheless think this opinion, when considered along with other recent ones, see e. g., Drake v. Dupont de Nemours & Co., Inc., 5 Cir., 1970, 432 F.2d 276, 1970 A.M.C. 1915, is driving us to a position which becomes more and more inflexible and effectively waters down protection which the law gives to *Sieracki-Ryan-Yaka* [Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 733; Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448] vicarious seamen. It does this in two principal ways. First, it magnifies *West*[1] to the point where a ship is not a "vessel". This denies warranties of seaworthiness where the "operational withdrawal" is for but a brief period of time. Second, with a Richard Dana *Two Years Before the Mast* approach, we are measuring the activity of the worker as though the tools and facilities of the Yankee Clipper were the guide for the Twentieth Century. Today's sailor—free from any real prospect of being Shanghaied or his health destroyed from an absence of the daily ration of anti-scorbutics—is everywhere using sophisticated equipment and techniques of which radar and electronic fire-detecting devices are examples, not to mention the exacting activities of crew members of our nuclear submarine fleet or the historic atomic A/V Savannah. This expands his role beyond the simple task of one who can hand, reef and steer.[2]

Here the Court holds (i) M/V Flying A was withdrawn from navigation because she was in shipyard undergoing maintenance repairs for about 15 days and (ii) Johnson, in sandblasting, with a device used for decades in refurbishing the exterior of land-based buildings was not doing the work of a traditional seaman.

*The Negligence Claim*

Before analyzing these two problems I think it helpful to discard as quite irrel-

1. West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161.

2. See Norris, The Law of Seamen, 3d Ed., Vol. 1, § 9, pp. 25–26. "[It] was once said that a 'seaman' meant a person who could 'hand, reef and steer,' a far cry from the duties of many of today's sea-farers. Unquestionably, the man in the wheelhouse of a deep-sea vessel with hand on helm keeping the ship on course is a seaman; and yet we find that the term has been applied to longshoremen; to a radio operator; to a stewardess; to a ferry hand; and even to a musician aboard a vessel."

evant some factors which the Court keeps bringing back in. These relate to the disposition of the "negligence" claim and the fact that the injury occurred *outside* of—not *on*—the vessel arising from the use of equipment furnished, not by the vessel, but the shipyard (or its lessor). Ever since Alaska S. S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, it has been clear that the shipowner is not insulated from responsibility because the contractor furnishes equipment of a kind which the shipowner reasonably knows will have to be used. Italia Societa v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732. From the standpoint of jurisdiction [3]—in the sense of the application of maritime principles— that depends not on the locale of the injury, but on the nature of the work in relation to the operation of the vessel.[4] The *Sieracki-Ryan-Yaka* seaman has a clear right to recovery for injuries sustained on the pier from cargo mishandled by the stevedoring contractor. Burrage v. Flota Mercante Grancolombiana S.A., 5 Cir., 1970, 431 F.2d 1229, 1970 A.M.C. 2254; Gutierrez v. Waterman Steamship Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, 1963 A.M.C. 1649. And in a number of instances we have held the shipowner accountable for the seaworthiness of devices located and used on the land.

Deffes v. Federal Barge Lines, Inc., 5 Cir., 1966, 361 F.2d 422, 1966 A.M.C. 1415; Law v. Victory Carriers, Inc., 5 Cir., 1970, 432 F.2d 376, 1970 A.M.C. 2215, cert. granted, 1971, 401 U.S. 936, 91 S.Ct. 937, 28 L.Ed.2d 215.

If the Court is wrong on (i) withdrawal of the vessel from navigation and (ii) the lack of traditional seaman's work, the negligence claim obviously presented a factual dispute on which the injured seaman has not yet had a trial of a kind the law assures him, either with or without a jury. Summary judgment on that score was unauthorized.

*Withdrawal of Vessel from Navigation*

Because her 13 man crew left on arrival in dry dock and did not return until some fifteen days later when repairs were completed, the Court holds M/V Flying A was withdrawn from navigation in the *West-Roper* sense. Just what the presence or absence of the crew has to do with the problem has never been clear and even my own limiting concurrence in *Moye*[5] is less and less satisfactory. A longshoreman injured in the hold from a defective fall or line (furnished by the employer stevedoring contractor) has a plain right of recovery on unseaworthiness. The presence or absence of the crew of 50 sailors is completely irrelevant.[6] Of course it would be relevant in those instances in

---

3. In addition to maritime principles there is diversity plus requisite amount in controversy here.

4. O'Donnell v. Great Lakes Dredge and Dock Company, 1943, 318 U.S. 36, 42–43, 63 S.Ct. 488, 492, 87 L.Ed. 596, 602, 1943 A.M.C. 149:
 "The right of recovery in the Jones Act is given to the seaman as such, and, as in the case of maintenance and cure, the admiralty jurisdiction over the suit depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters."
 In Braen v. Pfeifer Oil Transport Company, 1959, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191, 1960 A.M.C. 2, the Court on *O'Donnell, supra*, reiterated the "fact that the injury did not occur

on the vessel is not controlling, * * *. A 'seaman' may often be sent off ship to perform duties of his employment * * * [but he] is as much in the service of his ship when boarding it on first reporting for duty, quitting it on being discharged, or going to and from the ship while on shore leave, as he is while on board at high sea."

5. Moye v. Sioux City & New Orleans. Inc., 5 Cir., 1968, 402 F.2d 238, cert. denied, 1968, 395 U.S. 913, 89 S.Ct. 1759. 23 L.Ed. 226.

6. For example, had Johnson been chipping paint on the scaffold while the full crew was aboard M/V Flying A seaworthy warranties would be present even though the presence of the crew contributed nothing toward the accident or its causes.

which it is the crew, not the contractor's employee, which brought into play the unseaworthy conditions. A ship is hardly withdrawn from her employment as a vessel when she goes into a shipyard for required periodic survey and maintenance repairs—no more so than she would be when, as a cargo vessel, she puts into port for a 10 day discharging and loading of cargo with all or part of the crew allowed extended shore leave.

Of course duration of the "lay-up" is important, and even more so, is the activity (or lack of it) in an operational sense. To put a ship into a mothball fleet, and then to break her out one or two years later with the certain knowledge that re-outfitting is essential, is one thing. Likewise is the use of the vessel as a floating granary. But when the vessel is actively engaged in commercial trade—as M/V Flying A was for the year preceding drydocking—and she returns directly to that activity as an ocean-going bulk petroleum carrying vessel immediately after completion of the shipyard work, it is artificial to think that for that brief period she was withdrawn from navigation, and, for purposes of the law, that she ceased to be a ship. And, at a minimum, that conclusion could only be reached by a fact-finder from conflicting inferences, not as a matter of law by summary judgment.

From a reading of this Court's opinion one would think that the vessel was being wholly rebuilt. Cf. Watz v. Zapata Off-Shore Company, 5 Cir., 1970, 431 F.2d 100, 1970 A.M.C. 2307. Just how judges—"Solomonic or life tenured" [7]—can reach this conclusion as a *matter of law,* I do not know. If we know anything we know that in this inflated world in which a slight traffic tap precipitates an automobile repair bill running into the hundreds of dollars for bumper and fender damage, $30,000 will not buy much in the way of steel and skilled labor.

But we need not search out the limits of our prescience for this record shows not extensive re-outfitting, but routine, periodic maintenance repairs. Out of the 42 items on the ship repair invoice, 34 were for items not in excess of $500. Indeed, of the 34, over 16 were for less than $200 each. They covered such routine items as removal of a wasted sun visor over the pilot house window, building up a docking plug in a cargo tank, mucking out (cleaning) the anchor chain locker of mud and debris, a micrometer reading of the two tail shafts, renewal of a six-foot length of a one-inch pipe guardrail, replacing five deck vent ports, repairing five treads in two ladders (stairs), installing five steam hose hangars, and the like. The most extensive items were sandblasting and repainting the hull ($10,000) and the necessary lay days ($1,100). None of the other items was of a radical unusual or extensive nature. These include renewal of a 10-inch deck cargo header line on the main deck ($2,625), repairs to the starboard generator ($1,562), and pulling and reinstalling tail shafts and propellers ($2,952). Although these were important repairs which a prudent shipowner would undertake,[8] there is not a stitch of evidence in the affidavits or depositions to indicate that they were anything but routine periodic survey and maintenance repairs.

But considering the size of the vessel —260 feet in length—and her obvious value,[9] neither the dollar amount of these repairs nor their nature indicated anything so drastic as to characterize

---

7. Phillips v. Martin Marietta Corporation, 5 Cir., 1969, 416 F.2d 1257, 1259 (dissent), rev'd 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 [1971].

8. A number of the items were marked "ABS". This refers to the American Bureau of Shipping which, in the enforcement of federal ship safety standards, has a quasi-governmental status along with the Coast Guard.

9. At least if $30,000 was disproportionate to her value it ought to have been proved as a fact which was not done here.

the vessel as "withdrawn" from navigation.

In *Grigsby* [10] we rejected the literalism of *West* that a vessel would be taken out of navigation merely because the ship was not in the immediate control of her crew. From the instant case and other recent ones I fear that although we verbally give heed to our restricted reading of *West*, we take 10 to 15 days plus absence of the crew to add up in a mechanical way to the withdrawl from navigation. To be sure the Court says a case must be judged on its own facts. But what is the standard?—the irrelevancy of no crew member aboard?—the given fact of a number of days that it was inoperative?—the nature of repairs in terms of operational navigability? Or what?

Finally on this point the most that can be made out is that whether nature, kind, and cost (in dollars, time or both) of the shipyard work was so great as to characterize the temporary layup of the vessel as a withdrawal from navigation was a question of fact for a trial, not one for summary judgment on this record.

### Lack of Traditional Seaman Work

Little need be said about the second phase—traditional work of a seaman. The fact is that in *Jackson* [11] the Supreme Court has itself abandoned the rigid standards of *Halecki*.[12]

When the tool used (sandblaster) was no more novel than that employed for decades in building refurbishment, it does not change the nature of the work that is being done—chipping off the paint and rust—from that done by sailors for centuries. To paint the cleaned surface with a compressor-powered air

10. Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, 1969 A.M.C. 1513, cert. dism'd. Fidelity & Cas. Co. v. Grigsby, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; this was upheld on "instant unseaworthiness", 412 F.2d 1011 at 1030; in Usner v. Lukenbach, 1971, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562.

11. Jackson v. Lykes Bros. Steamship Co., Inc., 1967, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488. At note 4 of this opinion the Court pointed out:

 "In 1953 this Court held in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, that other kinds of maritime employees, besides stevedores, who performed jobs formerly done by seamen were entitled to the seaworthiness protection given in Sieracki. There we said:

 " 'It is pointed out that Sieracki was a "stevedore." Hawn was not. And Hawn was not loading the vessel. On these grounds we are asked to deny Hawn the protection we held the law gave Sieracki. These slight differences in fact cannot fairly justify the distinction urged as between the two cases. Sieracki's legal protection was not based on the name "stevedore" but on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness. The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading could go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law." 346 U.S., at 412–413, 74 S.Ct., at 206, 207 [98 L.Ed. at 152, 153].

 Subsequent decisions in line with the general concepts put forth by this Court have read Sieracki expansively, and a wide range of maritime employees have been granted the benefits of the seaworthiness doctrine. Carpenters (Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143); electricians (Feinman v. A. H. Bull S. S. Co., 3 Cir., 216 F.2d 393); shipcleaners (Torres v. The Kastor, 2 Cir., 227 F.2d 664, and Crawford v. Pope & Talbot, Inc., 3 Cir., 206 F.2d 784); repairmen (Read v. United States, 3 Cir., 201 F.2d 758); and riggers (Amerocean S. S. Co. v. Copp, 9 Cir., 245 F.2d 291), who performed jobs formerly done by seamen, have recovered from shipowners on the seaworthiness doctrine. See Note, 75 Yale L.J. 1174, 1183."

12. United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed. 2d 541.

brush would hardly change the work from painting with a brush out of a paint pot even though in the glorious days of the Clippers, Richard Dana and his foc's'le mates would have searched long in the bos'ns' locker for such a device.

M/V Flying A was very much in service—indeed the overhaul was to *keep* her in service, not to restore her to a service long abandoned. And with sandblaster in hand Johnson was doing that done for decades by those who go down to seas in ships. Or at least a jury should be the one to say.

I therefore respectfully dissent.