C. J. Paul DELOME, Plaintiff-Appellee,

v.

UNION BARGE LINE COMPANY et al.,
Defendants-Third-Party Plaintiffs-
Appellants-Cross Appellees,

v.

PLATZER SHIPYARD, INC., Third-Party
Defendant-Appellee-Cross Appellant.

No. 31037.

United States Court of Appeals,
Fifth Circuit.

June 8, 1971.

Rehearing Denied and Rehearing En
Banc Denied July 19, 1971.

John D. Rienstra, Jr., Beamont, Tex., for Union Barge Line Co.

Dewey J. Gonsoulin, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for cross-appellant, Platzer Shipyard, Inc.

Bill J. Sanders, Ned Johnson, Beaumont, Tex., Wayne Patterson, Port Arthur, Tex., Sanders & Sanders, Waldman & Smallwood, Beaumont, Tex., for appellee, C. J. Paul Delome.

Before O'SULLIVAN,* THORNBERRY and DYER, Circuit Judges.

DYER, Circuit Judge.

Union Barge Line Company and Platzer Shipyard, Inc., appeal from the District Court's judgment for Delome, a shipfitter injured on the Barge UBL 550 while it rested on a marine railway. Appellants contend that the trial court had no admiralty and maritime jurisdiction over this controversy, that the court's conclusions concerning the unseaworthiness of the barge and the negligence of Union were erroneous, and that the damages assessed were excessive. We vacate with directions.

An open-hopper cargo barge, the UBL 550 had no motive power and carried no crew. On its port and starboard decks were walkways twenty inches wide. Coamings 3$\frac{5}{16}$ inches high separated these walkways from the open cargo hatch. On the port side of the vessel, brackets extended into the walkway from the hatch coaming. Bitts (commonly known as timberheads) approximately

* Senior Circuit Judge, 6th Circuit, sitting by designation.

nine inches high, as well as a circular pumpwell cover, were located in the same walkway.

On July 22, 1966, the UBL 550 was delivered to Platzer's repair facility in Green's Bayou, Texas, for repairs to its forward rake area. Two days later the barge was placed on a marine railway and moved out of the water so that workmen could take a damaged plate from the forward rake and reseal the opening. During the evening shift on July 25, a foreman ordered Delome, one of the workers, to go onto the barge and enter the forward rake space through a hatchway. To facilitate ingress and egress, Platzer had placed a ladder twenty feet from the forward bulkhead on the port side. Employees such as Delome used this ladder to climb aboard.

Following his instructions, Delome reached the port walkway, As he started forward, he was temporarily blinded by the glare of a 1000-watt onshore light located on a pole near the vessel's bow. After taking a few steps in this dazzled condition, Delome fell ten feet into the open cargo hold.

Delome collected under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, then initiated this action against Union Barge Line Co. pursuant to Rule 9(h) of the Federal Rules of Civil Procedure.[1] Subsequently Union impleaded Platzer—the third-party complaint alleging that Platzer's negligence and breach of its duty of workmanlike performance proximately caused Delome's injury. According to the record, no party objected to the District Court's assumption of admiralty jurisdiction.

Sitting without a jury, the District Judge heard the evidence and concluded that, at the time of Delome's accident, the UBL 550 was a vessel in navigation; that Union owed a warranty of seaworthiness to Delome because he "was performing the traditional duties of a seaman in making minor repairs as a shipfitter;" and that Union had breached this warranty by providing an unseaworthy walkway, filled with trip hazards which circumscribed a hatch coaming insufficient in height. The court held that these breaches were causally related to Delome's fall. Furthermore, the court decided that Union was negligent in furnishing Delome with an unsafe place to work; it held that such negligence was a proximate cause of Delome's injuries. The court also determined that Platzer was negligent in failing to install a guard rail around the open hopper cargo area and in positioning its onshore light. Concluding that Platzer's negligence proximately caused Delome's injuries and constituted a breach of the duty of workmanlike performance owed to Union, the District Court held that Platzer was obligated to indemnify Union for all sums recovered by Delome as a result of the accident. Finally, the court found Delome 5% contributorily negligent and diminished his recovery by that percentage. It awarded damages of $213,437.69 together with interest at 6% per annum.

Both Union and Platzer have appealed. They question the District Court's assumption of admiralty jurisdiction and attack the court's conclusions with respect to the warranty of seaworthiness and duty to provide a safe place to work. They also assert that the damages assessed by the court were excessive.

## ADMIRALTY JURISDICTION

### A. *The Navigable Waters Test*

When Delome fell, the UBL 550 was located on a marine railway. Its

---

1. Rule 9 provides in pertinent part:
 (h) Admiralty and Maritime Claims. A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for these purposes whether so identified or not.

stern was approximately sixty-five feet inland. In fact, no part of the barge was on, or even over, navigable water. Consequently the Admiralty Extension Act [2] is inapplicable.

Postulating that breach of the warranty of seaworthiness is a maritime tort, Union and Platzer argue that Delome's "unseaworthiness" claim was not within the District Court's "admiralty and maritime jurisdiction" as articulated by the Constitution,[3] and defined by Congress [4] and the federal courts.[5] The vessel, the accident, and the injury were too remote from the water's edge, the traditional boundary of admiralty tort jurisdiction. Thus framed, the issue is simple, if somewhat wordy: whether the shoreward sweep of the silver oar encompasses a shipyard worker's suit against a vessel owner when the complaint alleges that the worker is a *Sieracki* [6] seaman injured because of the vessel's unseaworthiness, if the vessel is located on a marine railway outside navigable water.

Born of dicta [7] and nurtured by fiction,[8] the shipowner's warranty of seaworthiness in personal injury cases is now firmly rooted in federal maritime law.[9] For years this warranty was considered contractual in nature. *E.g.*, The

2. 46 U.S.C.A. § 740. The Extension Act provides in pertinent part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.
>
> In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water * * *.

3. U.S.Const. art. III, § 2.

4. *E. g.*, Jones Act, 46 U.S.C.A. § 688; Admiralty Extension Act, 46 U.S.C.A. § 740. Ostensibly there are limits to the congressional power. *See, e. g.*, O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 42–43, 63 S.Ct. 488, 87 L.Ed. 596; The Blackheath, 1904, 195 U.S. 361, 368–369, 25 S.Ct. 46, 49 L.Ed. 236 (Brown, J., concurring); The Lottawanna, 1874, 88 U.S. (21 Wall.) 558, 577, 22 L.Ed. 654; The Belfast, 1868, 74 U.S. (7 Wall.) 624, 640–641, 19 L.Ed. 266; Gebhard v. S.S. Hawaiian Legislator, 9 Cir. 1970, 425 F.2d 1303, 1316 (Wright, J., dissenting in part). *See also* Black, "Admiralty Jurisdiction: Critique and Suggestions," 50 Colum.L. Rev. 259 (1950); Maraist, "Proposed Discipline for a Procedural Problem Child: Reallocation of Admiralty Tort and Compensation Jurisdiction Between Federal and State Courts," 24 U.Miami L.Rev. 26 (1969); Morrison, "The Remedial Powers of the Admiralty," 43 Yale L.J. 1 (1933); Tetreault, "Seamen, Seaworthiness, and the Rights of Harbor Workers," 39 Cornell L.Q. 381 (1954).

5. Judicial applications of the rules delineated by The Plymouth, 1865, 70 U.S. (3 Wall.) 20, 35–36, 18 L.Ed. 125; The Osceola, 1903, 189 U.S. 158, 171, 175, 23 S.Ct. 483, 47 L.Ed. 760, and their progeny have evoked perceptive critical comment in a number of publications. *E. g.*, Tetreault, "Seamen, Seaworthiness, and the Rights of Harbor Workers," 39 Cornell L.Q. 381 (1954); Note, "Risk Distribution and Seaworthiness," 75 Yale L.J. 1174 (1966); Comment, "Seamen and the Warranty of Seaworthiness in Maritime Injuries—Sieracki Today," 34 Tulane L.Rev. 572 (1960); Comment, "A New Look at the Unseaworthiness Doctrine: The *Roper* Case," 29 U.Chi. L.Rev. 519 (1962).

6. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

7. The Osceola, 1903, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760; *see* United New York & New Jersey Sandy Hook Pilots Association v. Halecki, 1959, 358 U.S. 613, 616, 79 S.Ct. 517, 3 L.Ed.2d 541.

8. Latus v. United States, 2 Cir. 1960, 277 F.2d 264, 267, cert. denied, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55. *See also* Tetreault, "Seamen, Seaworthiness, and the Rights of Harbor Workers," 39 Cornell L.Q. 381 (1954).

9. *See generally* Bue, "Admiralty Law in the Fifth Circuit—A Compendium for Practitioners: I," 4 Hous.L.Rev. 350, 392–408 (1966) (pre-1966 judicial development).

*Osceola*, 1903, 189 U.S. 158, 171–75, 23 S.Ct. 483, 47 L.Ed. 760; Hamilton v. United States, 4 Cir. 1920, 268 F. 15, 21, cert. denied, 254 U.S. 645, 41 S.Ct. 15, 65 L.Ed. 454; Rainey v. New York & P. S.S. Co., 9 Cir. 1914, 216 F. 449, 453, cert. denied, 235 U.S. 704, 35 S.Ct. 209, 59 L.Ed. 433; *see* Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 90, 66 S.Ct. 872, 90 L.Ed. 1099. Recently, however, some courts have articulated the thesis that breach of the warranty is tortious. *E.g.*, Gebhard v. S.S. Hawaiian Legislator, 9 Cir. 1970, 425 F.2d 1303, 1310; Strika v. Netherlands Ministry of Traffic, 2 Cir. 1950, 185 F.2d 555, 558, cert. denied, 1951, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343; The Chiswick, 5 Cir. 1916, 231 F. 452, cert. denied, sub. nom. British Steamship Co. v. Clarke, 241 U.S. 673, 36 S.Ct. 723, 60 L.Ed. 1231, *see* Gutierrez v. Waterman Steamship Corp., 1963, 373 U.S. 206, 214–15, 83 S.Ct. 1185, 10 L.Ed.2d 297. Nevertheless, given their factual contexts, the latter expressions must be regarded as dicta: in each case the vessel was moored on navigable waters and the causes were, at least, within the purview of the Extension Act. *See, e. g.*, Strika v. Netherlands Ministry of Traffic, *supra*, 185 F. 2d at 556. Indeed, we have found no case in which a definition of the intrinsic nature of the warranty of seaworthiness was necessary for determination of a federal court's admiralty jurisdiction.

 The warranty of seaworthiness in personal injury cases essentially depends on neither common-law tort nor contract concepts. Dimas v. Lehigh Valley R.R., 2 Cir. 1956, 234 F.2d 151, 153. Instead, while the seaworthiness doctrine is comprised of both tort and contract elements, it is a creature of twentieth-century judicial policy concerning risk distribution in the shipping industry. In Seas Shipping Co. v. Sieracki, *supra*, the Supreme Court explicated this basis for the doctrine. It stated:

> Obviously the norm of the liability has been historically and still is the case of the seaman under contract

with the vessel's owner. This is because the work of maritime service has been done largely by such persons. * * *

> * * * * * *

Because rationalizing the liability as one attached by law to the relation of shipowner and seaman, where this results from contract, may have been thought useful to negative the importation of those common-law tort limitations does not mean, however, that the liability is itself contractual or that it may not extend to situations where the ship's work is done by others not in such an immediate relation of employment to the owner. That the liability may not be either so founded or so limited would seem indicated by the stress the cases uniformly place upon its relation, both in character and in scope, to the hazards of marine service which unseaworthiness places on the men who perform it. * * * Those risks are avoidable by the owner to the extent that they may result from negligence. And beyond this he is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its cost.

These and other considerations arising from the hazards which maritime service places upon the men who perform it, rather than any consensual basis of responsibility, have been the paramount influences dictating the shipowner's liability for unseaworthiness as well as its absolute character. It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. * * * [I]t is a form of absolute duty owing to all within the range of its humanitarian policy.

328 U.S. at 90–95, 66 S.Ct. at 875–877 (footnotes omitted) (citations omitted). This warranty does not apply solely to vessels plying their trade on the high

seas; it does not necessarily terminate, or become suspended, when ships reach calm waters or safe harbors. The warranty contemplates not only the turbulence of the oceans but also the conditions peculiar to ships, where space and equipment must be utilized carefully to minimize accident-inducing hazards. While the vessel owner's warranty does not mean that he has eradicated all risks or that his ship can weather all storms, it does indicate that the vessel is reasonably fit for the intended use. *See* Boudoin v. Lykes Brothers Steamship Co., 1955, 348 U.S. 336, 339, 75 S.Ct. 382, 99 L.Ed. 354. It is both absolute and nondelegable. United New York & New Jersey Sandy Hook Pilots Association v. Halecki, 1959, 358 U.S. 613, 616–617, 79 S.Ct. 517, 3 L.Ed.2d 541; *see* Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 259, 42 S.Ct. 475, 66 L.Ed. 927. Recently the Court added:

A major burden of the Court's decisions spelling out the nature and scope of the cause of action for unseaworthiness has been insistence upon the point that it is a remedy separate from, independent of, and additional to other claims against the shipowner, whether created by statute or under general maritime law. More specifically, the Court has repeatedly taken pains to point out that liability based on unseaworthiness is wholly distinct from liability based upon negligence. The reason, of course, is that unseaworthiness is a *condition,* and how that condition came into being— whether by negligence or otherwise— is quite irrelevant to the owner's liability for personal injuries resulting from it.

Usner v. Luckenbach Overseas Corp., 1971, 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562; *see* Aguirre v. Citizens Casualty Co., 5 Cir. 1971, 441 F.2d 141, 144.

■ To hold, then, that this uniquely maritime cause of action is circumscribed by the same admiralty jurisdictional boundaries as common-law "land" torts would contravene the risk distribution policy underlying the doctrine as well as common sense. *Cf.* O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 42–43, 63 S.Ct. 488, 87 L.Ed. 596. In reason and in practice, federal jurisdiction to consider alleged breaches of the shipowner's warranty to furnish a seaworthy vessel cannot depend on such gossamer classification. In another context Mr. Justice Harlan has said:

The confidence of people in their ability to predict the legal consequences of their actions is vitally necessary to facilitate the planning of primary activity and to encourage the settlement of disputes without resort to the courts. However, that confidence is threatened least by the announcement of a new remedial rule to effectuate well-established primary rules of behavior. There is no question in this case of any change in the duties owed by shipowners to those who work aboard their vessels. Shipowners well understand that breach of the duty to provide a seaworthy ship may subject them to liability for injury regardless of where it occurs, and for death occurring on the high seas or in the territorial waters of most States. It can hardly be said that shipowners have molded their conduct around the possibility that in a few special circumstances they may escape liability for such a breach. Rather, the established expectations of both those who own ships and those who work on them are that there is a duty to make the ship seaworthy and that a breach of that federally imposed duty will generally provide a basis for recovery. It is the exceptional denial of recovery that disturbs these expectations.

Moragne v. States Marine Lines, Inc., 1970, 398 U.S. 375, 403–404, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339. Justice Harlan's scholarly opinion articulates our thoughts here. That a vessel is drydocked does not necessarily mean that no warranty of seaworthiness is owed. `See, e. g.,` Johnson v. Oil Transport Co., 5

Cir. 1971, 440 F.2d 109, 115; Moye v. Sioux City & New Orleans Barge Lines, Inc., 5 Cir. 1968, 402 F.2d 238, cert. denied, 1969, 395 U.S. 913, 89 S.Ct. 1759, 23 L.Ed.2d 226; Rogers v. M/V Ralph Bollinger, E.D.La.1968, 279 F.Supp. 92, 95; Allen v. Union Barge Line Corp., E.D.La.1965, 239 F.Supp. 1004, 1008, aff'd, 5 Cir. 1966, 361 F.2d 217, cert. denied, 1967, 385 U.S. 1006, 87 S.Ct. 713, 17 L.Ed.2d 545. Nor does the fact that the ship is temporarily out of the water necessarily defeat federal jurisdiction with regard to causes involving possible breaches of the claimed warranty. Instead, as the cases illustrate, the warranty's existence and federal jurisdiction to consider alleged breaches depend on conceptual considerations, such as status, discussed *infra*. The *"in* navigable waters" spatial limitation is not determinative. It follows that any jurisdictional dichotomy between marine railways and other types of drydocks [10] regarding the warranty of seaworthiness would be a fictional artifice, contrived to ensure conformity to a spatial boundary which is not really pertinent. To abjure federal jurisdiction over this maritime doctrine on the basis of the navigable waters criterion would exemplify "the exceptional denial of recovery that disturbs" the established expectations of both those who own ships and those who work on them. It can hardly be said that shipowners have molded their conduct around the possibility that by placing their vessels on marine railways rather than in some other type of drydock, they may escape liability for breaches of the warranty of seaworthiness. The distinction would be as difficult to sustain rationally as that found wanting in *Moragne*. Consequently we hold that the navigable waters, or locality, test is inapplicable to an unseaworthiness claim demanding damages as a result of personal injuries occurring aboard a vessel on a marine railway.

### B. *The "Status" Touchstone*

To determine whether a warranty of seaworthiness is owed shoreside workers, examination of three status-oriented factors becomes essential. We focus on "the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury." West v. United States, 1959, 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed.2d 161; *accord*, Watz v. Zapata Off-Shore Co., 5 Cir. 1970, 431 F.2d 100, 108; Moye v. Sioux City & New Orleans Barge Lines, Inc., *supra*, 402 F.2d at 240.

▮ Concerning the status of the ship, clearly even a drydocked vessel may be subject to the warranty of seaworthiness if it is in navigation—*i. e.*, "engaged as an instrument of commerce and transportation on navigable waters." Rogers v. M/V Ralph Bollinger, *supra*, 279 F.Supp. at 94–95; *see* Hilton v. Aegean Steamship Co., D.Or.1965, 239 F. Supp. 268. After an extensive discussion of this subject, this Court concluded that a precise definition of the phrase "in

---

10. For purposes of the Longshoremen's and Harbor Workers' Compensation Act, marine railways have been identified as drydocks. Holland v. Harrison Brothers Dry Dock & Repair Yard, Inc., 5 Cir. 1962, 306 F.2d 369, 372–373; Avondale Marine Ways, Inc. v. Henderson, 5 Cir. 1953, 201 F.2d 437, 438, aff'd, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77; Continental Casualty Co. v. Lawson, 5 Cir. 1933, 64 F.2d 802, 804–805. That the test is functional—coverage under the Act being dependent on the type of work for which the facility was intended—is manifested by the fact that accidents on other types of docks have been considered outside the Act's scope. *See* Nacireme Operating Co. v. Johnson, 1969, 396 U.S. 212, 217 n. 10, 222–223, 90 S.Ct. 347, 24 L.Ed.2d 371; Travelers Insurance Co. v. Shea, 5 Cir. 1967, 382 F.2d 344, 346–347, cert. denied, 389 U.S. 1050, 88 S.Ct. 780, 19 L.Ed.2d 842; O'Leary v. Puget Sound Bridge & Dry Dock Co., 9 Cir. 1965, 349 F.2d 571; American Mutual Liability Insurance Co. v. Neumann, S.D.Ala.1969, 1970 A.M.C. 466. *But see* Note, "Dockside Injuries Under the Longshoremen's and Harbor Workers' Compensation Act," 3 Ga.L.Rev. 622 (1969).

navigation" is impossible. Johnson v. Oil Transport Co., *supra,* 440 F.2d at 115. Indeed, the navigational status of the vessel ordinarily remains a question of fact. Roper v. United States, 1961, 368 U.S. 20, 22–23, 82 S.Ct. 5, 7 L.Ed.2d 1. Nevertheless, a vessel which temporarily leaves commerce, enters a shipyard for minor repairs, and thereupon returns to commerce remains in navigation for purposes of the warranty. *See* Drake v. E. I. DuPont deNemours & Co., 5 Cir. 1970, 432 F.2d 276, 277–278; Martin v. Jones, E.D.La.1968, 296 F.Supp. 878, 881; Rogers v. M/V Ralph Bollinger, *supra;* Allen v. Union Barge Line Corp., *supra,* 239 F.Supp. at 1007; Hilton v. Aegean Steamship Co., *supra.*

Concerning the pattern of repairs, the limiting factor is tradition: it "requires that the injured shore-based worker be engaged in work traditionally that of a seaman, * * * excluding those persons performing such tasks as making major repairs requiring drydocking or special skills." Atkins v. Greenville Shipbuilding Corp., 5 Cir. 1969, 411 F.2d 279, 282, cert. denied, 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96; *see* Drake v. E. I. DuPont deNemours & Co., *supra,* 432 F.2d at 278. Moreover, "[t]he inquiry is not who best can bear the risk, but whether the repair *project*—not the specific task—is one that 'seamen' historically have performed." Watz v. Zapata Off-Shore Co., *supra,* 431 F.2d at 107.

■ Concerning the extensive nature of the work contracted to be done, little need be said; for this criterion is intertwined with the "in navigation" requirement discussed previously. Generally "dead" ships, those withdrawn from navigation and undergoing major repairs, are not subject to the warranty of seaworthiness. West v. United States, *supra,* 361 U.S. at 122, 80 S.Ct. 189; Johnson v. Oil Transport Co., *supra,* 440 F.2d at 112; Baum v. United States, 5 Cir. 1970, 427 F.2d 215, 217; Stark v. United States, 5 Cir. 1969, 413 F.2d 253;

Van Horn v. Gulf Atlantic Towing Corp., 4 Cir. 1968, 388 F.2d 636, 638; Latus v. United States, 2 Cir. 1960, 277 F.2d 264, 266, cert. denied, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55; Union Carbide Corp. v. Goett, 4 Cir. 1958, 256 F.2d 449, 455, rev'd on other grounds, 1959, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341; Guenard v. United States, E.D.La. 1968, 278 F.2d 310. Conversely, as noted earlier, vessels undergoing minor repairs remain subject to the warranty.

Applying these variables in the factual context *sub judice,* it is clear that the UBL 550 was a vessel in navigation undergoing minor repairs at the time of Delome's injury. The barge remained at the shipyard for seven days, of which three were spent in making repairs costing only $3688.76. However, it is equally clear that the members of Delome's crew were not doing the type of work traditionally performed by seamen. The record discloses that the UBL 550 entered Platzer's shipyard for minor structural repairs which necessitated drydocking the vessel. While the barge was not out of navigation, its flotation capability was, at least, impaired during the repair process. Moreover, cutting a large, heavy plate out of the forward rake and inserting a new one required special equipment, including a winch truck and crane, not normally categorized as appurtenant to the vessel. Finally, whatever Delome's particular function may have been, his crew was engaged in a specialized task demanding training and skills not customarily found among seamen. To summarize, the repairs undertaken were not such as could have been performed in the ordinary course of business in the shipping industry. They could have been accomplished only on a drydocked vessel, with special equipment, and by a trained crew of shipfitters, not seamen. Manifestly, then, the District Court's finding with respect to the type of work in which Delome and the other members of his crew were engaged was clearly erroneous. Therefore, Union owed Delome no warranty of seaworthi-

ness since he was not even a *Sieracki* or *Hawn* [11] "seaman."

Neither the navigable waters criterion nor the Extension Act encompasses Delome's negligence claim against Union. Certainly our disapprobation of the navigable waters limitation in unseaworthiness cases does not preclude its application in a common-law tort action. *See, e. g.,* Watz v. Zapata Off-Shore Co., *supra,* 431 F.2d at 110. As we have said, Union owed Delome no warranty of seaworthiness. Furthermore, undisputably the UBL 550 was inland, removed from navigable waters, at the time of Delome's accident. Consequently the District Court had no admiralty jurisdiction over the common-law negligence claim.

### DIVERSITY JURISDICTION

Delome invoked, and the District Court assumed, admiralty jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure. Although we have held that the court had no admiralty jurisdiction, the court might have considered the negligence allegations—that Union had failed to provide Delome's crew with a reasonably safe place to work—under diversity principles. *See* 28 U.S.C.A. § 1332. To determine whether such jurisdiction exists, we have reviewed Delome's complaint, as well as relevant portions of the trial transcript.

After averring that the case was within the admiralty and maritime jurisdiction, Delome noted in his complaint that he "is a resident of Orange County Texas." Furthermore, he alleged:

Defendant Union Barge Line Company is a foreign corporation or foreign business organization and the address of its home office is Dravo Bldg., 5th and Liberty Streets, Pittsburg 22, Pennsylvania; such Defendant does business in the State of Texas from time to time and the cause of action asserted herein arose in the State of Texas; that such Defendant does not maintain a regular office in the State of Texas nor has it designated an agent for service of process and therefore its agent for service of process is the Secretary of State of the State of Texas under the provisions of Article 2031-b of the Texas Civil Statutes.

Examination of the complaint reveals two facts: First, Delome stated these allegations to obtain service of process under article 2031b, a long-arm statute, rather than to show diversity of citizenship. Second, Delome's allegations are insufficient to confer federal jurisdiction under 28 U.S.C.A. § 1332. Standing alone, an allegation that a party is a resident of a certain state is not a sufficient allegation of his citizenship in that state. Pattiz v. Schwartz, 8 Cir. 1968, 386 F.2d 300, 301; CORE v. Clemmons, 5 Cir. 1963, 323 F.2d 54, 58, cert. denied, 1964, 375 U.S. 992, 84 S.Ct. 632, 11 L.Ed.2d 478; Texaco-Cities Service Pipe Line Co. v. Aetna Casualty & Surety Co., 8 Cir. 1960, 283 F.2d 144, 145; Gorman v. King, E.D.Wis.1970, 50 F.R.D. 195, 197. *See generally* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1208 (1969). Moreover, an allegation that a corporation's home office is located in a certain state is not equivalent to a declaration that its principal place of business is situated in that state. *See, e. g.,* Anniston Soil Pipe Co. v. Central Foundry Co., N.D.Ala.1963, 216 F.Supp. 473, aff'd, 5 Cir. 1964, 329 F.2d 313. *See also* 28 U.S.C.A. § 1332 (c).

We have discerned nothing in the remainder of the record to cure these defects. *See, e. g.,* DeVries v. Starr, 10 Cir. 1968, 393 F.2d 9, 11. Consequently, the admiralty jurisdictional underpinning having been removed, and no diversity jurisdiction appearing, this Court cannot now consider Delome's substantive negligence claim.

The judgment of the District Court is vacated for lack of jurisdiction and the cause is remanded with directions that it be dismissed without prejudice.

11. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

Vacated and remanded with directions.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.