Luvornia **COPELAND**, widow of Randolph Copeland, as Administratrix and Personal Representative of the Estate of Randolph Copeland, Individually, and as natural tutrix of the minor children, Randolph E. Copeland, Jr., et al., Plaintiff,

v.

**OIL TRANSPORT, INC.**, et al., Defendants.

Civ. A. No. 6790-71.

United States District Court, S. D. Alabama, S. D.

June 27, 1973.

Samuel S. Dalton and Ronald P. Herman, New Orleans, La., Robert E. Gibney, Mobile, Ala., for plaintiff.

Wm. P. Boggs, W. Boyd Reeves and Norman E. Waldrop, Jr., Alex T. Howard, Jr., Mobile, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styed cause was heard by the Court without a jury and taken un-

der submission December 28, 1972. The Court, after considering the testimony, exhibits, arguments of counsel and briefs, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This action results from the asphyxiation of Randolph E. Copeland, Sr., while he was working as an outside boilermaker/laborer aboard the S.S. TEXAN. This cause was instituted on August 2, 1971, in the U. S. District Court for the Eastern District of Louisiana on behalf of Luvornia Copeland, individually, as the lawful widow of Randolph Copeland, Sr., and as the administratrix of the Estate of Randolph E. Copeland, Sr., and the natural tutrix of Randolph E. Copeland, Jr., age 13, Veronda Copeland, age 10 and Torrance Copeland, age 4, the natural children born of the marriage between Luvornia Copeland and Randolph E. Copeland, Sr.

2. The two-count complaint, alleging unseaworthiness and negligence, was filed under the admiralty jurisdiction of the federal courts and seeks to recover compensatory damages from the vessel, *in rem*, and against Oil Transport, Inc. and Hendy International Co., *in personam*, as the owners and agents for the vessel, for the wrongful death of Copeland. Upon the motion of the Defendants for a change of venue, based on *forum non conveniens*, the U. S. District Court for the Eastern District of Louisiana transferred this proceeding to the Southern District of Alabama. The defendants instituted a third-party action against Alabama Dry Dock & Shipbuilding Co. (hereinafter ADDSCO) claiming breach of warranty of workmanlike performance and breach of contract and asking either for indemnification of any judgment against it or that ADDSCO assume the defense of the case. Shortly thereafter the attorney for ADDSCO did assume the defense for Oil Transport and the other defendants. ADDSCO later intervened, represented by another attorney, claiming a lien under the Longshoremen's and Harbor Workers' Compensation Act for the amount of the compensation paid as a result of Copeland's death in the event the plaintiff is successful in this action.

3. The S.S. TEXAN, according to the Coast Guard Certificate, was built in 1946, is 610.5 feet in length and has a gross tonnage of 13,274. The vessel was converted to a chemical tanker by ADDSCO in 1957. In 1970 the vessel was regularly engaged in navigation as a chemical tanker and was valued in excess of seven million dollars.

4. Representatives of the vessel and ADDSCO conducted negotiations in the Spring of 1970 about the work to be done on the S.S. TEXAN. They reached a firm understanding that along with the other work to be done the 6A cofferdam was to be waterblasted and repainted. This was part of a scheduled maintenance of the cofferdams but was the first time that this waterblasting technique had been used on this vessel. Waterblasting was used, instead of sandblasting, since it was felt that it would eliminate the problem of sand accumulating in the narrow cofferdam area which had occurred in previous maintenance jobs. Specifically it was understood that the water would drain out of the cofferdam into the double bottom of the vessel and out of the vessel by means of a hole to be cut in the outer shell while on drydock.

5. Since ADDSCO did not have waterblasting equipment it was agreed that Mobile Coating, Inc. would do the work as an independent contractor. Waterblasting consists of directing water under extremely high pressure against the substance to be removed. While this process requires a good deal of specialized equipment and protective clothing, it apparently does not require a highly trained operator. A strong back seems to be the main requirement for the operator. The equipment for such an operation is placed on the vessel. It was agreed that this work was to begin early Monday morning, May 18th, but because of Copeland's death it was delayed.

6. Exactly what repairs were agreed to prior to drydocking is difficult to determine. There was no written agreement that specified all the work to be done on the TEXAN at the time the vessel reached ADDSCO on May 15, 1970. However, the parties had dealt with each other previously and it is obvious that there was a firm agreement as to some of the work to be done. The shell plate renewal and testing, the cofferdam reconditioning, work on the lifeboat, air conditioning installation and installing new generators were some of the major items agreed to before the vessel docked. Mr. Maloney, employed by the shipowner, testified that approximately 50% of the work performed was contracted to be done prior to Copeland's death. Though this is not viewed as being a precisely accurate statement, it does indicate that a reasonable amount of the total work performed on the TEXAN was agreed upon after May 18. Plaintiff's exhibit #4, entitled "Specifications for Annual Overhaul, Drydocking and U.S.C.G. Biennial Inspection", dated May 8, 1970, with an addendum of May 15, indicated that there was possibly agreement on as many as 120 items of work as of May 15.

7. The work performed on the S.S. TEXAN is described in bills from ADDSCO and other suppliers and contractors. The bills from ADDSCO were prepared as the work progressed and though written in the future tense reflect work completed or nearly completed at the time they were written. Defendant's exhibit No. 1 is the main bill from ADDSCO. The bill is forty-eight pages long, contains 154 items and represents $490,201.00 of work. Some of the more important items in the bill are: #1 Drydocking, $26,283.00; #4 Bottom and shell plate renewal, $95,168.00; #20 Tank Leaks (includes repairs to No. 7 Center tank to Cofferdam, an 8″ fracture), $4,470.00; #34, 35, and 36 Anchor windlass and chain repairs, approximately $30,000.00; #53 install air con-

dition in crews quarters, $74,135.00; #64 Rebrick boiler, $15,578.00; #73 Gas Free Certificate, $3,316.00; #70 Rework Auxiliary generator, $10,952.00; #74 Services (includes fire watches, pier rental, line handlers, power, water, air, steam, water service for ice machine and sanitary purposes and, as needed, for culinary purposes), $5,347.00; #97 Lifeboat Davits, $24,814 and 119 Cofferdams and double bottom tanks-cleaning for gas free (includes Cofferdam 6A), $24,722.00.

8. Additional bills from ADDSCO and independent suppliers and contractors total approximately $100,000.00. Mobile Coating, Inc. charged $17,210.00 for waterblasting and painting cofferdams #3 and 6A and wingtanks G and H. There is a bill for $14,493.60, mentioned above as Item #53, for the air conditioning equipment that ADDSCO installed. Two generators cost $10,800.-00 and the new lifeboat was $10,173.11. The American Bureau of Shipping billed $1,812.50 for an annual survey. Most of these bills indicate order dates in April and early May for supplies.

9. The U. S. Coast Guard requires that vessels such as the TEXAN secure a biennial certificate of inspection.[1] At the time of Copeland's death on May 18 the TEXAN was operating under a certificate that was to expire the next day. The Coast Guard requires that the vessel be drydocked for the biennial inspection. At a minimum, such an inspection would require several days since the vessel must be drydocked and the hull cleaned before the inspection can begin. The Coast Guard conducts the thorough inspection, noting any deficiencies in the vessel and requiring their correction before recertification and sailing.

10. The drydocking in Mobile was a scheduled part of voyage 104E. The return voyage, 104W, was scheduled well in advance of the drydocking and this required the TEXAN to leave Mobile without the Coast Guard required lifeboat in order to make the next scheduled

1. 46 C.F.R. 31.10-15.

port which was in Louisiana on June 10. The Coast Guard re-certified the TEXAN and allowed it to sail conditioned upon it obtaining a lifeboat in Texas.

11. During the entire time that the TEXAN was in Mobile the articles of all members of the crew were in full force and ·the crew reported daily for work aboard the vessel from 8 to 5, five days a week. The crew was billeted ashore at least partially because of the air conditioning installation in the crew's quarters. Crew discipline was maintained and ship's log was kept.[2] While in drydock the vessel was at all times on shore power, water and steam.

12. The TEXAN arrived in Mobile Friday, May 15, 1970. The vessel went into drydock and at 4:15 p.m. Mr. Backes issued a Marine Chemist's Certificate which stated that cofferdam 6A (among other areas) was "Safe for Men —Safe for Fire".[3] There was a little work done on the vessel between the drydocking on Friday and Monday morning. The vessel was placed on shore power and water, sea valves were opened and the boilers and engines were shut down. The vessel had over four hundred tons of fuel and three hundred tons of fresh water in its tanks. There was food in the refrigerated lockers and the refrigeration continued to operate while in drydock.

13. Copeland and his crew were called to work Sunday night. Generally they were to clean and straighten up the vessel so work crews arriving Monday morning could quickly begin work. Specifically Copeland and co-worker Charles Monarch were instructed to remove the two manhole covers in the bottom of 6A cofferdam. This cofferdam is two feet

six inches fore and aft, fifty feet athwartship and thirty-eight feet from the main deck down to the top of the double bottom. About 10 feet below the main deck is a grating where it is possible for a person to stand. Monarch, a large man in excess of six feet tall and two hundred pounds, went inside the cofferdam to begin work but the space was too small for him to work, so he came up and waited on the grating. Copeland then went down and loosened the bolts on the port side manhole cover and removed the cover. When Copeland came to the main deck he was coughing. This was about midnight. Monarch went home as his shift was over. Another worker named Dees had previously cleaned the starboard manhole cover and Copeland went down to remove it.[4] Copeland started acting unusual and did not respond to calls. He went into a rage and started banging his hands against the sides of the cofferdam. Attempts to rescue him from above were unsuccessful. It was 8:00 a.m. before workers went into the cofferdam and removed Copeland's body. Copeland never removed the starboard manhole cover.

14. Copeland used no safety equipment other than a coworker to watch him, though masks and other safety equipment were available. The cofferdam was marked gas free and the difficulty of working in that small of an area possibly discouraged Copeland from using any bulky safety equipment. It is doubtful that Copeland comprehended the danger that would have been apparent to experienced supervisory personnel.

15. It was stipulated by the parties that Copeland died by inhaling poisonous

2. An entry in the log for May 18th reads as follows:
"08–12 Oiler & F.W.T.—Mayoski & Anderson reported late in no condition to perform duties. Discharge for Cause."

3. In the transcript of the Coast Guard Investigation, Captain Egerer, Master of the TEXAN, testified that the cofferdams were often checked for gas, that the vessel had a gas detector onboard and that the double bottom or cofferdam could be

gas freed by flooding the compartment. Some compartments were gas freed by the vessel just prior to entering ADDSCO. See p. 9–10 of Plaintiff's Exhibit #5.

4. The 6A cofferdam was initially certified gas free. However, the removing of the port side manhole cover voided the certificate. Thus when Copeland descended on the starboard side the 6A cofferdam had no current gas free certificate.

gases aboard the vessel. The gases were probably of the halogen family. They were apparently given off from cargo residues which had leaked into the double bottom from, among other possible sources, cracks in the cargo tanks.

16. Randolph Copeland was 35 years old at the time of his death. He reported $3,950.88 income in 1969 and $2,919 income for 1970 to the time of his death. These returns reflect income from ADDSCO beginning April 8, 1969, until his death May 18, 1970. Though his income fluctuated from week to week there was a definite increase in weekly income during the 13 months of his employment. His hourly rate increased from $3.22 to $3.56 during the time he worked for ADDSCO. His highest weekly earning occurred the week prior to his death when he earned $251.85 for 54.5 hours of work. Though there might have been difficulties at times in the marriage, Randolph Copeland made a reasonable effort to provide for his family. He had been married to Luvornia Copeland since 1957. Randolph Copeland's funeral expenses were $763.52.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333.

2. This *Moragne* [5] wrongful death action presents difficult questions in an area admitted to have "ragged edges"[6] and with an uncertain course for the future.[7] There are three issues before the Court: (1) Was Copeland doing work traditionally done by seamen and hence a person entitled to the warranty of seaworthiness? (2) Did the shipowner negligently fail to provide a safe place to work? (3) Was the S.S. TEXAN "out of navigation" and therefore not extending a warranty of seaworthi-

ness? If the resolution of these issues indicate a verdict in favor of the plaintiff, then the question of damages must be dealt with.

*Work traditionally done by seamen*

3. This question presents comparatively little difficulty. In order to be entitled to a warranty of seaworthiness the individual must be a "seaman" or performing work traditionally done by a seaman. The *Sieracki* [8] and *Hawn* [9] seamen were extended coverage by the Supreme Court because:

> His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or *of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law.* 346 U.S. at 413, 74 S.Ct. at 207 (emphasis added).

A limit to this doctrine was announced in United Pilots Assn. v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959) where the Supreme Court said:

> Neither these decisions (*Sieracki* and *Hawn*) nor the policy that underlies them can justify extension of liability for unseaworthiness to the decedent in the present case. The work that he did was in no way "the type of work" traditionally done by the ship's crew. It was work that could not even be performed upon a ship ready for sea, but only when the ship was "dead" with its generators dismantled. Moreover, it was the work of a specialist, requiring special skill and special equipment. . . . 358 U.S. at 617, 79 S.Ct. at 519.

The Fifth Circuit and the Southern District of Alabama have had many opportunities to interpret the Supreme Court

---

5. Moragne v. States Marine Lines, et al., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

6. Johnson v. Oil Transport, 440 F.2d 109, 115 (5th Cir. 1971).

7. Longshoremen's and Harbor Workers' Act Amendments of 1972, 86 Stat. 1256,

33 U.S.C. § 901 et seq. See footnote 1 in Brock v. Coral Drilling, Inc., 477 F.2d 211 (5th Cir. 1973).

8. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

9. Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

decisions in *Sieracki, Hawn* and *Halecki.*[10]

■ 4. Defendant urges that Copeland's removing the manhole covers was a necessary part of the waterblasting operation; that waterblasting is the appropriate "work project" that the Court should look to in resolving this issue and that waterblasting, like the chemical spraying in *Halecki,* is highly technical and not work traditionally done by seamen. Defendant relies primarily on the language in *Watz* (footnote 5) at page 108 where the Court "view(s) the repair project as a whole rather than (the) specific assignment".

5. Copeland was employed by the shipyard as a laborer. On the night in question Copeland along with other members of his gang, was cleaning and straightening the vessel. There was no specialized equipment used in this work not did it require any specialized training. It is work that seamen have been doing for centuries. To the Court's knowledge it was work that could have been performed at sea. The waterblasting operation was done by an independent contractor and was not even scheduled to begin until six or eight hours after Copeland's death. In fact, the waterblasting began several days later. It is not clear if Copeland even knew about the waterblasting plans.

6. To argue "but for" the manhole covers being removed the waterblasting operation could not be carried is too easily extended to an absurdity. Such argumentation quickly leads to the proposition that since drydocking is necessary for the waterblasting operation the workers involved in drydocking are part of the waterblasting project. This is a line of reasoning the Court squarely rejects finding no such broad interpretation of "work project" in the more recent *Johnson, Drake* or *Delome* decisions.

7. Neither is the Court impressed with the argument that Copeland was part of a gas-freeing operation. There were no marine chemists nor gas detectors near Copeland's work gang. Even if Copeland was involved in the "work project" of gas-freeing, which this Court squarely rejects, removing hatch covers is certainly work traditionally done by seamen, and gas-freeing is work done by seamen aboard the SS TEXAN as testified to by the Master of the TEXAN.[11]

### Negligence

■ 8. One theory of the plaintiff's cause of action alleges that the shipowner failed to furnish Copeland a safe place to work. The shipowner is under a duty to refrain from negligent conduct and within this duty is the requirement of providing a safe place to work. This is a nondelegable obligation but not absolute. It requires that the shipowner exercise reasonable care. Liability for failure to furnish a safe place to work is resolved under principles of negligence.[12] Who controlled the vessel and the work aboard it are of primary importance in resolving this issue.[13] The Court is well satisfied that ADDSCO was in control of the work and not the shipowner. The shipowner was not controlling the details of the work nor is there evidence that any representatives of the owner were present aboard the vessel at the time of the accident.

10. Johnson v. Oil Transport, supra; Delome v. Union Barge Lines, 444 F.2d 225 (5th Cir. 1971); Watz v. Zapata, 431 F.2d 100 (5th Cir. 1970); Drake v. E. I. DuPont de Nemours & Co., 432 F.2d 276 (5th Cir. 1970).

11. See footnote 3, p. 15 of the Findings of Fact.

12. Pope & Talbot v. Hawn, 346 U.S. 406 (1953) and cases footnoted therein at p. 413, 74 S.Ct. 202, 98 L.Ed. 143.

13. See West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959) and the many cases thereunder. "It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which make the place unsafe." West, 361 U.S. at p. 123, 80 S.Ct., at p. 193. See also Johnson v. Oil Transport, supra, 440 F.2d at pp. 111–12.

Therefore the Court finds no negligence on the part of the defendant in allowing the work to be performed as it was. The shipowner was not responsible to see that Copeland wore gas masks or other safety equipment. The shipowner contracted for ADDSCO to gas-free the vessel and was justified in relying on ADDSCO to properly perform the contract.

9. The *West* decision allowed that "there might be instances of hidden or inherent defects, sometimes called 'latent,' that would make the owner guilty of negligence, even though he had no control of the repairs".[14] Plaintiff has urged two theories that are supported by cases of the Fifth Circuit under which the shipowner could be found negligent without being in control of the vessel during the repair work.

■ 10. Plaintiff urges that under the doctrine enunciated in Marshall v. Isthmian Lines, Inc., 334 F.2d 131 (5th Cir. 1964) and Manning v. M/V "Sea Road", 417 F.2d 603 (5th Cir. 1969) the defendant was negligent *per se* for violating the provisions of 46 C.F.R. 35.-01–1 and 29 C.F.R. 1915.14. Reading

the cited section of Title 46 C.F.R. it is easy to see that the concept of negligence *per se* is not applicable to the present situation (see the discussion in *Marshall*, supra, 334 F.2d pages 133–136). The regulation is designed to prevent fire, much like the regulations dealt with in *Marshall*. The section places two obligations upon the vessel. First, Section "c" requires that a qualified person test for dangerous gases. Secondly, Section "d" requires that, "insofar as the persons under his (i. e. the senior officer) control are concerned" the gas free condition of the vessel is not violated. Both of these obligations were met by the vessel. Aside from the *per se* feature of the argument, the Court is not persuaded as to the usefulness of this section as a "standard of care" to be considered by the Finder of Fact on this question of negligence.

■ 11. The cited section of Title 29 C.F.R.[15] is likewise not applicable to the doctrine of negligence *per se* because Section 1915.2(c) [16] provides the definition of "employer", the one upon whom the obligation is placed for maintaining the gas free condition. This definition

---

14. West, supra, 361 U.S. at p. 124, 80 S. Ct., at p. 193.

15. Text of Section 29 C.F.R. 1915.14 provides: "Maintaining gas free conditions. The following rules shall apply in maintaining gas free conditions: (a) Pipe lines which may convey hazardous substances into the spaces certified "Safe For Men—Safe For Fire" shall be disconnected or blanked off, or other positive means shall be used to prevent discharge of hazardous substances from entering the space. Manholes and other closures which were secured when tests were made shall remain secured. If such manholes or other closures are opened or any manipulation of valves takes place which tends to alter existing conditions, work in the affected spaces or areas shall be stopped and not resumed until such time as the area has been retested and again certified "Safe for Men—Safe For Fire" in accordance with the requirements of § 1915.13(a).

(b) Before hot work is commenced on the weather deck over spaces which, under these regulations, are not required to be

gas freed or inerted, all valves, closures and vents, except those which are vented up masts, connecting with non-gas free tanks or compartments below, shall be closed. Valves, closures and vents shall not be opened until hot work is completed unless the hot work is stopped and the work location posted as unsafe for fire. The latter notice shall not be removed nor hot work resumed until the area is again made safe.

(c) The employer shall inform masters and chief engineers of vessels of the provisions of this section and shall confirm that they are aware of their responsibilities for seeing that their crews understand and obey all warning signs, tags, and the limitations stated on the marine chemist's certificates. . . . ."

16. "(c) The term 'employer' means an employer any of whose employees are employed, in whole or in part, in ship repair or related employments as defined in this section on the navigable waters of the United States, including dry docks, graving docks and marine railways."

of an "employer" would not include the defendant in this case nor are there *Yaka*[17] or *Jackson*[18] principles present which alter this interpretation of the definition. Section (c) of 29 C.F.R. 1915.14 further evidences that, in this case, the employer with the obligation of complying with the regulations is clearly ADDSCO. Neither is this section persuasive as a standard of care to be imposed upon the defendant.

12. The plaintiff further urges that Stark v. U. S., 413 F.2d 253 (5th Cir. 1969) requires this Court to view the issue of negligence at the time of the creation of the dangerous condition. In *Stark* the Fifth Circuit was considering the case after the District Court had granted defendant's motion for summary judgment. *Stark* at page 254 said:

> In *West* the dangerous condition was caused by a fellow worker at a time subsequent to the turning over of the ship to the contractor. Here, the fire was allegedly caused by a faulty condition existing in the storage tanks and pipe which resulted in gas leakage. Unanswered on this record is whether the United States turned over a ship that was allegedly, but not actually, gas free.
>
> The shipowner had surrendered possession and control at the time of the accident, but that is not decisive. The crucial time is the time of the creation of the dangerous condition or latent defect. Whether due care under all the circumstances was used by the United States at relevant times, and to what proportion, if any, others might have been at fault, are questions of fact to be determined by the fact finder after a full trial.

13. The leaks in the tanks of the SS TEXAN and resulting accumulation of poisonous fumes in the double bottom were an unavoidable occurrence. A vessel at sea is obviously unable to repair every defect immediately when it occurs. The owners of the vessel were evidently aware of the leaks in the tank but they posed no problem to the navigation of the vessel. The defendant was not negligent in failing to gas free the double bottom. They had taken reasonable precautions in gas freeing some of the compartments prior to entering port and in contracting with ADDSCO for further gas freeing operations.

Was the SS TEXAN "in navigation"?

14. The plaintiff's second theory of relief is based on the alleged unseaworthy condition of the SS TEXAN. The defense asserts that at the time of the accident the SS TEXAN was not in navigation and hence no warranty of seaworthiness was owed to Copeland.

15. The warranty of seaworthiness requires that the vessel, appurtenances and crew be reasonably fit for its intended purpose. The warranty is extended by a vessel in navigation to those coming aboard performing work traditionally done by seamen. The warranty is not a standard of perfection but it is an absolute duty imposed without regard to fault. As *Sieracki*[19] explained the warranty exists not because of a contractual theory but rather because of the relationship of the seaman to the vessel. This humanitarian warranty[20] is extended to seamen because of the danger of their work and the difficulty for seamen to accurately judge the safety of a vessel. Therefore they must be able to rely on the warranty that the vessel is in fact seaworthy. As ships have become larger, more complicated and more dangerous the warranty has expanded to protect seamen from the increased hazards involved in their work.[21] Having previously deter-

17. Reed v. S.S. Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963).

18. Jackson v. Lykes Bros. Steamship Co., 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967).

19. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

20. *Sieracki*, supra, at p. 95, 66 S.Ct. 872.

21. See generally, Norris, Maritime Personal Injuries, Sec. 31, 2nd ed., 1966.

mined that Copeland was performing work traditionally done by seamen, there remains only to be determined whether the SS TEXAN was "in navigation" at the time Copeland was injured.

16. In West v. United States, 361 U. S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), a worker had been injured on board the SS MARY AUSTIN, a "Liberty" ship and member of the "mothball fleet", which was being towed to a shipyard for reactivation. The Supreme Court held that the vessel was not in navigation and therefore did not extend a warranty of seaworthiness to the injured worker. At page 122, 80 S.Ct. at page 192 the Court said:

> It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case. It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury.

Determining whether a vessel is in navigation or not is a question of fact, Roper v. United States, 368 U.S. 20, 82 S. Ct. 5, 7 L.Ed.2d 1 (1961); Erwin v. Lykes, 472 F.2d 1217 (5th Cir. 1973).

17. The tripartite test as outlined by West is now well accepted as the guide in determining whether a vessel is in navigation.[22] It, however, provides no precise answer as it is necessary to balance a great many factors in arriving at a determination.[23] Additionally, it must be decided at which time each factor will be viewed and how the factors balance against each other in light of the purpose of the warranty.

18. West first commands that the Court look to the "status of the ship". As Judge Simpson noted in Drake, supra:

> That the barge was not in navigation seems hardly plausible. The barge had been involved in regular transport operations immediately prior to her delivery to Levingston, and the testimony indicates that all intentions were that she would return to the open waterways after the annual inspection and repairs. 432 F.2d at page 277. See also Delome, 444 F.2d at p. 232.

Similarly the SS TEXAN was regularly engaged in commerce immediately before and after the drydocking. The drydocking was primarily for biennial inspection and regular maintenance. The vessel could have hardly been more actively engaged in commerce. The necessity to finish the work in time to make the next port on the west bound voyage caused the SS TEXAN to leave port without a lifeboat and possibly resulted in conducting the work at unsafe pace that contributed to Copeland's death. The entire crew remained under articles and reported for work each day and ship's discipline was maintained. There was fuel, water and food aboard. At the time of Copeland's death the vessel had been in drydock less than sixty hours and no substantial work had begun. The "status" of the SS TEXAN clearly indicates that it was "in navigation".

19. West next directs that the "pattern of the repairs" be considered. The only major item of work that was done on the SS TEXAN that could be considered "structural" would be the installation of the air conditioning equipment in the quarters, which totaled approxi-

---

22. Delome v. Union Barge Lines, 444 F. 2d 225 (5th Cir. 1971); other recent cases on this subject in the Fifth Circuit are: Rogers v. United States, 452 F.2d 1149 (5th Cir. 1972); Johnson v. Oil Transport, 440 F.2d 109 (5th Cir. 1971);

Drake v. Dupont, 432 F.2d 276 (5th Cir. 1970); Grigsby v. Coastal Marine, 412 F.2d 1011 (5th Cir. 1969); Moye v. Sioux City, 402 F.2d 238 (5th Cir. 1968).

23. Delome, supra, 444 F.2d pp. 231–232.

mately $100,000. Virtually all other items of work were to replace, renew, recondition, repair, clean, repaint or test the SS TEXAN. The SS TEXAN left ADDSCO June 9, 1970, as a renewed, cleaner and air-conditioned version of her former self. The repairs certainly were not home port structural repairs but were necessary routine maintenance. Thus the pattern of the repairs to the SS TEXAN were of a nature that indicates that the vessel remained in navigation.

20. Finally, *West* admonishes that the Court look to "the extensive nature of the work contracted to be done". As *Delome,* supra, points out 444 F.2d at page 232:

> this criterion is intertwined with the "in navigation" requirement discussed previously. Generally "dead" ships, those withdrawn from navigation and undergoing major repairs, are not subject to the warranty of seaworthiness.

Having already characterized the repairs as routine maintenance it would seem that only the cumulative effect of the repairs in terms of the total contract price, might warrant finding that the vessel was out of navigation. Plaintiff strongly urges, with some merit, that only the work contracted for at the time of Copeland's death should be considered by the Court. Even if the final contract value of approximately $600,000.00 is used the Court is impressed with two factors. First, this is not nearly so large an amount when compared to the value of the vessel, estimated to be easily in excess of seven million dollars. Secondly, given the nature of the warranty of seaworthiness, and the many factors considered in determining

whether a vessel extends such a warranty to an injured worker an analysis stated in terms of total contract value pales in persuasiveness. Randolph Copeland probably had no knowledge of the total contract value or the extent of the work to be done on the S.S. TEXAN when he came aboard on Sunday, May 17th.

21. Thus, under guidance of *West* and the Fifth Circuit authority thereunder, the S.S. TEXAN was in navigation and owed Randolph Copeland a warranty of a seaworthy vessel. The S.S. TEXAN was clearly unseaworthy by reason of the poisonous gases in the double bottom.

## DAMAGES

Having determined that the plaintiff is entitled to recover, it is now necessary to determine the amount of damages recoverable under Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). The Supreme Court left for "further sifting through the lower courts" [24] the question of what are compensable damages. I felt that the course was becoming clearer by virtue of the Fifth Circuit decisions of Dennis v. Central Gulf Steamship Corp., 453 F.2d 137 (5th Cir. 1972); Gaudet v. Sea-Land Services, Inc., 463 F.2d 1331 (5th Cir. 1972); Canal Barge Co. v. Griffith, 480 F.2d 11 (5th Cir. 1973). However, I note [25] that the mandate in *Canal Barge Co.,* supra, has been stayed pending an en banc hearing of Johnson v. Penrod Drilling Company, 478 F.2d 1208 (5 Cir. 1973) and Starnes v. Penrod Drilling Company, 478 F.2d 1208 (5 Cir. 1973). Consequently, the fixing of damages in the instant case is stayed pending the outcome of *Johnson* and *Starnes.*

24. *id.,* at 408, 90 S.Ct., at 1792.

25. Canal Barge Co., Inc. v. Griffith, 480 F.2d 11 (5th Cir. 1973).